# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 12, 2000 Session

## STATE OF TENNESSEE  v.  DAVID M. KEEN

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 90-06629     Hon. John P. Colton, Judge**

---

**No. W1997-00147-SC-DDT-DD - Filed October 5, 2000**

---

The appellant was sentenced to death for the murder of eight-year-old Ashley Nicole Reed in 1990. On automatic appeal, this Court reversed the sentence based upon improper jury instructions, and we remanded the case for resentencing.  See State v. Keen, 926 S.W.2d 727 (Tenn. 1994).  At the second sentencing hearing, the appellant was again sentenced to death, and the Court of Criminal Appeals affirmed.  On automatic appeal from this second sentencing hearing, this Court has requested additional argument and briefing on the following five issues: (1) whether the evidence was legally insufficient to support the jury's finding of the "especially heinous, atrocious, or cruel" aggravating circumstance; (2) whether permitting the jurors to find *either* "torture" *or* "serious physical abuse beyond that necessary to produce death" denied the appellant his constitutional right to a unanimous jury finding of the basis for the "especially heinous, atrocious, or cruel" aggravating circumstance; (3) whether the jury instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance failed to narrow the class of persons eligible for the death penalty; (4) whether the trial court's failure to permit the jury to consider the sentencing option of life without parole violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections eight and sixteen of the Tennessee Constitution; and (5) whether the trial court erred in refusing the defendant's special request for an instruction on circumstantial evidence.  We hold that none of these issues warrants reversal of the sentence.  We further hold that the two aggravating circumstances found by the jury are amply supported by the evidence, and we agree that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Finally, we hold that the sentence of death was not arbitrarily or disproportionately applied in the appellant's case.  With respect to all other issues not specifically discussed in this opinion, we agree with and affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the**
**Court of Criminal Appeals Affirmed**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON, C.J., and JANICE M. HOLDER, J., joined. ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion. FRANK F. DROWOTA, III, J., not participating.

W. Mark Ward, Assistant Shelby County Public Defender, Memphis, Tennessee, for the appellant, David M. Keen.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michael J. Fahey, II, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee.

**OPINION**

The present appeal in this capital case arises from the resentencing of the appellant, David M. Keen, who pleaded guilty in February of 1991 to first degree murder in perpetration of the rape of eight-year-old Ashley Nicole (Nikki) Reed. The appellant was sentenced to death by a Shelby County jury, but this Court reversed the sentence on automatic appeal after finding reversible error in the "failure of the trial judge to properly include in the jury instructions that aggravating circumstances must be proven to outweigh any mitigating circumstances 'beyond a reasonable doubt.'" See State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994). We remanded the case to the Shelby County Criminal Court for a new sentencing hearing, and on August 15, 1997, a jury again sentenced the appellant to death for the murder of Nikki Reed. The Court of Criminal Appeals affirmed the sentence of death after this second hearing.

On automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1), the appellant's case was docketed in this Court. The appellant raised fourteen issues in his initial brief, and after carefully examining the entire record and the law—including the opinion of the Court of Criminal Appeals and the briefs of the appellant and the State—this Court entered an order limiting argument and requesting additional briefing on the following five issues:

(1)    whether the evidence was legally insufficient to support the jury's finding of the "especially heinous, atrocious, or cruel" aggravating circumstance;

(2)    whether permitting the jurors to find *either* "torture" *or* "serious physical abuse beyond that necessary to produce death" denied the appellant his constitutional right to a unanimous jury finding of the basis for the "especially heinous, atrocious, or cruel" aggravating circumstance;

(3)    whether the jury instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance failed to narrow the class of persons eligible for the death penalty;

(4)    whether the trial court's failure to permit the jury to consider the sentencing option of life without parole violated the Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections eight and sixteen of the Tennessee Constitution; and

(5)    whether the trial court erred in refusing the defendant's special request for an instruction on circumstantial evidence.

For the reasons given herein, we find that none of the issues raised by the appellant merits reversal of the sentence, and we remand this case for enforcement of the judgment of this Court.

## EVIDENCE PRESENTED AT THE SENTENCING HEARING

The evidence presented at the second sentencing hearing was substantially similar to the evidence presented by the State and the appellant at the first sentencing hearing in 1991. Nevertheless, because many of the issues raised in an automatic appeal involve questions concerning the evidence supporting the applicable sentencing criteria, it is necessary to review anew all of the evidence presented during this second sentencing hearing.

At the time of the tragic events giving rise to this case, the appellant was living with his then-fiancée, Deborah Wilson, in a three-bedroom mobile home in Millington, Tennessee. Also living with the appellant and his fiancée were Deborah's four children, including Ashley Nicole, her mother, and her father. During the late afternoon of March 17, 1990, the appellant and Deborah met her mother and father at the VFW Club in West Memphis, Arkansas, to eat dinner and play bingo. All of Deborah's children were spending the night with various friends. Shortly after the appellant and Deborah arrived at the VFW Club, Deborah's father, Jessie Wilson, expressed some concern over Nikki's arrangements to sleep over at a friend's house. The appellant offered to go back to Millington to check on Nikki, and Mr. Wilson allowed the appellant to borrow his car to make the short trip.

The appellant left the VFW Club at about 5:30, and he returned about two hours later. Upon returning, he told everyone that Nikki was spending the night with her friend, Shantell. The group stayed at the VFW Club until about 10:30 that evening, and on his way back home to Millington, Mr. Wilson noticed that the green blanket he usually kept in his car was missing. Mr. Wilson questioned the appellant about the blanket, but the appellant merely replied that he put the blanket in the back seat of the car because he did not want to sit on it.

The next morning, Deborah and the appellant went shopping at the local Wal-Mart while Mrs. Wilson went to pick Nikki up for church. When Mrs. Wilson returned home, she told her husband that Nikki did not go to her friend's house the previous evening, and the two of them searched around the mobile home park for Nikki. When Deborah and the appellant returned from shopping, they joined the search for Nikki. After searching all day and finding no trace of his

granddaughter, Mr. Wilson told Deborah to report Nikki's disappearance to the police. Deborah and the appellant then left on foot for the police station to file a missing persons report.

In the meantime, Mr. Wilson and his wife again searched the trailer park, and after waiting some time for Deborah and the appellant to return from the police station, they decided to drive to the police station themselves. As soon as Mrs. Wilson opened the door to get into her car, she saw a pair of panties lying on the passenger-side floorboard. Mr. Wilson told his wife not to move the panties, and they drove to the police station where they notified an officer about their discovery. When Mr. Wilson later approached the appellant about the panties in the car, the appellant was evasive and would not answer his questions.

The next day, a detective with the Millington Police Department asked the appellant and Deborah to come to the police station for questioning. Although the appellant initially denied any involvement in Nikki's disappearance, he admitted after further questioning by the police that he "threw her in the river." The appellant then took the detective and others officers to Memphis along the north end of Mud Island in the Wolf River, where the police found Nikki's naked body wrapped in a green blanket. Although the police found a blue denim skirt and a pink shirt wrapped with the body, the officers found no panties.

The appellant was taken to the Memphis Police Department where he again confessed to the murder of Nikki Reed. The appellant stated that when he found Nikki, he intended to take her back with him to West Memphis because he was unsure whether she could spend the night with her friend. In his initial statement to the Millington police, the appellant stated that on the return trip to West Memphis, he and Nikki argued about something concerning her seat belt. The appellant stated that during this argument, he became very angry, grabbed Nikki's throat, and covered her mouth until she turned blue. Although he admitted to wrapping Nikki's body in the green blanket and throwing her into the river, he could not remember whether he struck her, took her clothes off, or raped her.

However, when questioned further in Memphis about the incident, the appellant admitted to his actions in gruesome detail:

> I pulled off to the side of the road and undressed Ashley and undid my pants, and I held my hand over her throat and tried to penetrate [her]. I felt crap and I stopped, and Ashley had turned blue in the face. She wasn't breathing. I tied a shoe lace around her neck and she still was not breathing. I untied the shoe lace, wrapped her up in a blanket, tied the blanket together and dumped her off into the river off of the old Auction Street boat Dock. Then I went back over to West Memphis and told Ashley's mother that Ashley was spending the night at her friend, Shantell's, house.

The appellant also stated that Nikki struggled "for a little while," although she did not scream or holler, because he "was practically on top of her with [his] hand on her throat." Nikki was eight years old and weighed sixty-eight pounds.

At the sentencing hearing, the State called Dr. Jerry Francisco, the Shelby County Medical Examiner, to testify as to the results of the victim's autopsy. Dr. Francisco testified that Nikki suffered multiple scrapes and bruises to her face and neck, and that she had a deep ligature mark around the front of her neck caused by a tightly-pulled fabric cord, such as a shoelace. The medical examiner also found a bruise and scrapes around her genital area and a tear on the posterior wall of the vagina. Sperm heads were also found inside the vagina. Dr. Francisco determined that Nikki was alive while she was raped and suffered the various injuries, although he could not say with certainty that she was conscious during the entire episode.

In addition, the autopsy revealed that fluid was found in the lungs of the victim. Although Dr. Francisco stated that fluid in the lungs can be associated with either drowning or asphyxia, he testified that the left side of the heart was diluted, which "is the type of change you see in a person who is alive and submerged." Although the medical examiner stated that the ligature strangulation was the actual cause of death, he also stated that "[i]n my opinion, she was alive at the time she was placed in the water."

In mitigation, the defense called the appellant's adoptive parents, Robert and Evelyn Brieschke, who adopted the appellant and his older brother when the appellant was four years old. His adoptive parents testified that the appellant was malnourished when he was first adopted, and that he was very nervous and upset, had difficulty playing and interacting with others, and had difficulty sleeping. The appellant was diagnosed with Attention Deficit Disorder in fourth grade, and he was placed on Ritalin, which offered some improvement. The Brieschkes later learned from a psychological report completed before the appellant's adoption that the appellant was in need of immediate help and counseling, although this information was kept from them at the time of the adoption. In high school, the appellant skipped classes, smoked marijuana, and drank alcohol. At one point, he was arrested for breaking into an automobile agency and stealing a car. In his junior year, the appellant dropped out of high school and joined the United States Navy.

The appellant's brother and two stepsisters testified that the appellant's natural father was physically and emotionally abusive. Because his father was wanted for theft and child neglect, he constantly moved his family to evade arrest, and during one two-year period, the family moved no less than twenty-six times. The children were beaten on a daily basis, sometimes with electrical cords and pieces of lumber. The father would also slaughter livestock in front of his children while threatening to do the same to them if they misbehaved. One of the appellant's sisters, who admitted being the victim of sexual abuse, described their childhood as "an environment of terror." Even after the appellant was abandoned by his natural parents, he was placed in an abusive foster home before being adopted by the Brieschkes.

The defense also called Dr. John Ciocca, a clinical psychologist, who conducted a psychological evaluation of the appellant and testified as to the results. Dr. Ciocca diagnosed the appellant as suffering from post-traumatic stress disorder, serious depression, and attention deficit disorder. Dr. Ciocca stated that the appellant also showed some signs of pedophilia, although he

admitted that he found no indications of persistent and constant sexual interest in children, which is necessary for a proper diagnosis. One of the tests administered by Dr. Ciocca indicated that the appellant suffered from occasions "where he is not in good contact with reality," and that another test showed the "presence of psychotic-like symptoms."

Dr. Ciocca also interviewed the appellant and his family, and he reviewed numerous medical and psychological records, including an evaluation conducted at Winnebago State Hospital in Wisconsin. From an examination of these interviews and records, Dr. Ciocca testified that the appellant was "born into a family of crisis," which "had fallen on hard times," and in which "physical abuse and sexual abuse were rather rampant." Although he was relocated to a foster home, the appellant remembered being abused and anally raped by his foster father. According to Dr. Ciocca, the absence of nurturing, along with the presence of general hostility or apathy toward the appellant significantly affected his normal childhood development. Dr. Ciocca also stated that the appellant was "extraordinarily distressed at what he's done," and that he "takes full responsibility for it."

The State argued to the jury that the facts supported the presence of two aggravating circumstances: (1) that the murder was committed against a person less that twelve years of age and the defendant was eighteen years of age or older, see Tenn. Code Ann. § 39-13-204(i)(1); and (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, see Tenn. Code Ann. § 39-13-204(i)(5). The appellant, on the other hand, argued that fourteen statutory and non-statutory mitigating circumstances applied and should be considered.[1] The jury found that the State proved both aggravating circumstances beyond a reasonable doubt, and after finding that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, the jury sentenced the appellant to death. The jury made no specific findings as to which, if any, mitigating circumstances were supported by the proof.

## I. REVIEW OF THE AGGRAVATING AND MITIGATING CIRCUMSTANCES

---

[1] The specific statutory and non-statutory mitigating circumstances charged to the jury were (1) that the defendant has no significant history of criminal behavior; (2) that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) that the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment; (4) that the defendant was physically abused as a child; (5) that the defendant was sexually abused as a child; (6) that the defendant was abandoned and neglected as a child; (7) that the defendant was emotionally deprived as an infant and during early childhood; (8) that the defendant was deprived of nutrition as a child; (9) that the defendant did not receive continued counseling and psychotherapy for persons who are sexually and physically abused; (10) that the defendant has been diagnosed with attention deficit disorder; (11) that the defendant has been diagnosed as having post-traumatic stress disorder; (12) that the defendant was a productive citizen in our society prior to his arrest; having served our community in the military and been employed; (13) that the defendant acknowledges the seriousness of the crime he has committed and accepts responsibility for his actions; and (14) that the defendant is ashamed of his actions. The trial court also included a "catch-all" instruction to the jury that it could consider any other mitigating circumstances not specifically recited in the charge.

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), this Court is charged with independently determining whether the evidence supports the jury's finding of statutory aggravating circumstances and whether the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. In determining whether the evidence supports the application of an aggravating circumstance, the proper standard to consider is whether, after reviewing the evidence in the light most favorable to the State, "a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000); State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000); State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999). After a careful review of the testimony and evidence presented at the sentencing hearing, we conclude that the evidence fully supports the jury's findings that both aggravating circumstances are present in this case and that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

### A. Tennessee Code Annotated section 39-13-204(i)(1)

Tennessee Code Annotated section 39-13-204(i)(1) provides as a statutory aggravating circumstance that "[t]he murder was committed against a person less that twelve (12) years of age and the defendant was eighteen (18) years of age, or older." The record indisputably shows that the victim in this case, Nikki Reed, was eight years old at the time of her death and that the appellant was twenty-seven years old. Viewed in a light most favorable to the State, we conclude that a rational trier of fact could have found the existence of this aggravating circumstance beyond a reasonable doubt.

### B. Tennessee Code Annotated section 39-13-204(i)(5)

Tennessee Code Annotated section 39-13-204(i)(5) provides as a statutory aggravating circumstance that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." The appellant makes three arguments as to how this aggravating circumstance was improperly applied to the facts and circumstances of this case. First, he argues that the proof was insufficient to justify finding this aggravating circumstance beyond a reasonable doubt because the proof failed to demonstrate that the victim was conscious while she was tortured or suffered serious physical abuse beyond that necessary to cause death. Second, the appellant argues that his right to a unanimous jury was compromised by allowing the jury to consider either torture or serious physical abuse in finding the presence of this aggravating circumstance. Last, the appellant argues that the (i)(5) aggravating circumstance has been interpreted so broadly as to render it unconstitutional in that it fails to sufficiently narrow the class of death-eligible defendants. Having thoroughly considered each of the appellant's arguments, we find that none has merit, and we affirm the jury's finding of the presence of this aggravating circumstance beyond a reasonable doubt.

### 1. Evidentiary Sufficiency of the (i)(5) Aggravating Circumstance

The "especially heinous, atrocious or cruel" aggravating circumstance "may be proved under either of two prongs: torture or serious physical abuse." See State v. Hall, 8 S.W.3d 593, 601 (Tenn. 1999). This Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Morris, 24 S.W.3d 788, 797 (Tenn. 2000); State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). The phrase "serious physical abuse beyond that necessary to produce death," on the other hand, is "self-explanatory; the abuse must be physical rather than mental in nature." Hall, 8 S.W.3d at 601; see also State v. Suttles, __ S.W.3d __, __ (Tenn. 2000). The "word 'serious' alludes to a matter of degree," and the term "abuse" is defined as "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'" State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996); see also State v. Nesbit, 978 S.W.2d 872, 887 (Tenn. 1998); Morris, 24 S.W.3d at 797.

Our case law is clear that "[t]he anticipation of physical harm to oneself is torturous" so as to establish this aggravating circumstance. See State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999) (citing cases from other jurisdictions); see also Nesbit, 978 S.W.2d at 886-87; State v. Hodges, 944 S.W.2d 346, 358 (Tenn. 1997). Our case law is also clear that the physical and mental pain suffered by the victim of strangulation may constitute torture within the meaning of the statute. See State v. Cauthern, 967 S.W.2d 726, 732-33 (Tenn. 1998); Hodges, 944 S.W.2d at 358. The facts of this case, when viewed in a light most favorable to the State, easily satisfy both of these definitions. From the appellant's own statements, we know that this child was essentially kidnaped and secreted to a discrete and remote location—by someone in a position of trust—under the pretense that she was being taken to see her mother. The appellant stopped the car, and Nikki watched him take off his pants and then remove her own clothes. While still in the strict confines of the front seat of the car, the appellant climbed on top of her, covered her mouth, and began to forcibly rape her while crushing her throat with his left hand.

At some point while she was being violently raped, Nikki was struck in several parts of her face, and her head was smashed against the door handle. Although it is impossible to know how long Nikki remained conscious during this terrifying ordeal, it is uncontroverted that she was alive and conscious at least through part of the rape, because even though the full weight of the appellant was crushing her and even though she was being manually strangled, the appellant admitted that Nikki struggled to get free with her arms and legs. In fact, the appellant candidly admitted that she struggled to get free for "a little while." When the appellant finished his gruesome act, he noticed that she was no longer breathing and had turned blue, a fact he attributed to putting "too much pressure on her [neck] where she couldn't breathe."

There can be no reasonable doubt that while she struggled to free herself, Nikki was alive and conscious, and a jury could rationally infer from its common sense and everyday experience that she was extremely concerned about her own physical safety. Cf. Nesbit, 978 S.W.2d at 886 (stating that juries in capital cases may still "use their common knowledge and experience in deciding whether a fact is logically deducible from the circumstances in evidence, or in making reasonable inferences from the evidence, and may test the truth and weight of the evidence by their own general knowledge and judgment derived from experience, observation, and reflection"). Moreover, the jury would have

been fully justified in concluding that as the appellant gradually choked off all air to the child, Nikki was in an extreme state of mental pain and anxiety, as well as enduring and intense physical pain. A rational jury using common sense and judgment could clearly find that the proof established, beyond a reasonable doubt, the torture of the victim through infliction of severe mental and physical pain, and our cases require no more.

The appellant cites this Court's decision in State v. Odom for the proposition that the proof was insufficient to establish "torture" because penile rape alone cannot establish torture. We agree with Odom to the extent that a rape, in and of itself, cannot support imposition of the death penalty when the crime charged is murder in the perpetration of a rape. The appellant ignores, however, that the mental anguish of the child in this case was not derived solely from the act of penile penetration. Rather, the severe mental and physical pain of the victim necessary to establish "torture" is derived from all of the surrounding circumstances of the *murder*, which necessarily include the kidnaping and forcible confinement of the victim by someone in a position of trust, the brutal rape of the victim, and the violent manual strangulation of the victim to the point that she lost consciousness and turned blue.

While the mere *fact of rape* could not be used to impose death under the facts of the appellant's case, the sentencing authority certainly could have inquired into the unique circumstances surrounding the offense to determine whether the victim was "tortured" within the meaning of the (i)(5) aggravating circumstance. Contrary to the appellant's assertions, we find nothing in Odom which prevents a thorough examination of the circumstances surrounding the rape and murder. In fact, Odom's legitimate concerns with sufficient narrowing of the death-eligible class of defendants are actually furthered by such an examination, and only in this manner can the sentence of death be reserved for the "worst of the worse." Based on our review of the entire record in the present case, we find that a rational jury could have concluded from all of the surrounding circumstances that Nikki Reed was tortured through the infliction of severe mental and physical pain.

The appellant also argues that the proof is insufficient to establish that the victim suffered serious physical abuse beyond that necessary to produce death. Again, we must disagree. By the appellant's own admission, he manually choked the victim so forcefully that she stopped breathing, turned blue, and lapsed into unconsciousness. A rational jury could certainly have found that this particular manual strangulation constituted serious physical abuse beyond that necessary to produce death, even though the manual strangulation was not determined to be an actual cause of death. The law is clear that "[t]here is no requirement that the cause or mode of death also be the cause or mode of the 'serious physical abuse beyond that necessary to produce death.'" Nesbit, 978 S.W.2d at 887. Accordingly, we have no hesitation in also concluding that a rational jury could have found beyond a reasonable doubt that this murder was especially heinous, atrocious, or cruel in that it involved serious physical abuse beyond that necessary to produce death.

### 2. Right to Unanimous Jury Finding as to Either "Torture" or "Serious Physical Abuse Beyond That Necessary to Produce Death"

The appellant next argues that by permitting the jurors to find *either* "torture" *or* "serious physical abuse beyond that necessary to produce death," the trial court denied him his constitutional right to a unanimous jury for the "especially heinous, atrocious, or cruel" aggravating circumstance. More specifically, the appellant notes that when the jury returned its verdict form, it indicated that it found that "the murder was especially heinous, atrocious, or cruel in that it involved torture *or* serious physical abuse beyond that necessary to produce death." (emphasis added). The appellant argues that because the jury returned its verdict in the disjunctive, "there is no way to determine whether the twelve jurors unanimously agreed on either basis for finding the aggravating circumstances or the facts in support thereof." In essence, the appellant argues that unless a jury unanimously agrees as to a particular set of facts constituting guilt—or in this case, the particular set of facts constituting the presence of the (i)(5) aggravating circumstance—a defendant is denied his or her right to a unanimous jury. After reviewing the applicable case law, we hold that the appellant was not denied his constitutional right to a unanimous jury or that a special unanimity instruction was required.

It is beyond question that the right to a unanimous jury verdict is "fundamental, immediately touching on the constitutional rights of an accused." See, e.g., State v. Burlison, 501 S.W.2d 801, 804 (Tenn. 1973). Our research reveals no case, however, in which we have held that the right to a unanimous jury verdict encompasses the right to have the jury unanimously agree as to the particular theory of guilt supporting conviction for a single crime. See, e.g., State v. Lemacks, 996 S.W.2d 166, 170-71 (Tenn. 1999) (holding that jury need not be unanimous as between direct criminal liability or criminal responsibility arising out of the same transaction because criminal responsibility is not a "separate distinct crime"); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998) (holding that general verdict of guilt on first degree murder poses no constitutional problem even though some jurors may have convicted the defendant based upon proof of felony murder or premeditated murder). In fact, we have recently reached just the opposite conclusion in State v. Adams, 24 S.W.3d 289 (Tenn. 2000). In Adams, this Court was asked to decide whether a jury must unanimously agree on a specific serious bodily injury resulting from child neglect before it can properly return a guilty verdict for aggravated child abuse through neglect. In affirming the defendants' conviction and sentence, we stated,

> To adopt the appellants' argument that the jury must agree as to the specific serious bodily injury [supporting conviction for aggravated child abuse through neglect] requires, in essence, that the state elect the *facts to support elements* rather make an election of *offenses*. Our cases have not required that a jury unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the appellant is guilty of the crime charged.

24 S.W.3d at 297 (emphasis in original). The United States Supreme Court has also stated that "different jurors may be persuaded by different pieces of evidence, even when they agree on the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." Schad v. Arizona, 501 U.S. 624, 632 (1991).

It is clear that "torture" and "serious physical abuse beyond that necessary to produce death" are separate methods or theories of establishing the (i)(5) aggravator and not separate aggravating circumstances by themselves. We have stated previously that the phrase "especially heinous, atrocious, or cruel" is a unitary concept, State v. Van Tran, 864 S.W.2d 465, 479 (Tenn. 1993), which "may be proved under either of two prongs: torture or serious physical abuse." See Hall, 8 S.W.3d at 601. Our cases simply do not require that jurors agree as to which theory supports the view that the murder is "especially heinous, atrocious, or cruel." So long as the proof is sufficient under either theory for finding the aggravating circumstance beyond a reasonable doubt, and so long as all jurors agree that the aggravating circumstance is present and applicable to the case at hand, different jurors may rely upon either theory to reach their conclusion. See Suttles, __ S.W.3d at __ ("This [(i)(5)] aggravating circumstance may be applied if the evidence is sufficient to support either torture or serious physical abuse beyond that necessary to produce death."), and cases cited therein.

As we have previously stated, the proof in this case was more than sufficient to allow a rational jury to find the (i)(5) aggravating circumstance beyond a reasonable doubt under either a theory of torture or a theory of serious physical abuse beyond that necessary to produce death. This is not a case where the gruesome acts by the appellant establishing either torture or serious physical abuse occurred at such different times or under such varying circumstances that they could be said to be separate in fact. Rather, the proof established that the victim's severe mental pain and manual strangulation occurred proximately in time and space. In addition, we note that the court properly instructed the jury that it had to unanimously agree that the State proved this aggravating circumstance beyond a reasonable doubt, and the jury clearly indicated from its verdict form that it unanimously found the (i)(5) aggravating circumstance to be present and applicable in this case. Based on these reasons, we conclude that the appellant was not deprived of his right to a unanimous jury verdict.

In response, the appellant quotes a passage from State v. Brown, 823 S.W.2d 576 (Tenn. Crim. App. 1991), as standing for the proposition that a jury must understand "its duty to agree on a particular set of facts." Id. at 583. A closer reading of Brown, however, shows that this language served only to reemphasize that "the purpose of election is to ensure that each juror is considering the same occurrence," see State v. Shelton, 851 S.W.2d 134, 158 (Tenn. 1993), and it does not support the proposition that a jury must agree to the facts establishing a theory of an offense. The defendant in Brown was charged in an open-dated indictment with possession of cocaine, and the proof established that the defendant engaged in conduct constituting the charged crime on at least four separate occasions. In reversing the defendant's conviction, the Court of Criminal Appeals only required unanimous agreement as to the specific occurrence of the crime, id. at 583-84, not agreement as to the facts supporting different theories of guilt arising out of that one occurrence. Once a jury has agreed on the specific occurrence at issue, Brown cannot properly be read to require further agreement as to the particular facts supporting the elements of that offense when different theories are available for consideration.

The appellant also cites the capital sentencing statute which states that no death sentence may be imposed "but upon a unanimous finding that the state has proven beyond a reasonable doubt the

existence of one or more of the statutory aggravating circumstances . . . ." Tenn. Code Ann. § 39-13-204(i). A plain reading of this statute only requires that the jury unanimously agree that the aggravating circumstance in question is present; it does not require that the jury agree as to all facts establishing the presence of that circumstance when different theories are available for consideration. Where the language of the statute is clear and unambiguous, we will not extend the meaning of that statute beyond its plain and obvious import. See, e.g., McClain v. Henry I. Siegel Co., 834 S.W.2d 295, 296 (Tenn. 1992). This issue is without merit.

### 3. Constitutionality of the (i)(5) Aggravating Circumstance

The appellant next argues that the meaning of the "especially heinous, atrocious, or cruel" aggravating circumstance has been so broadly interpreted by the courts of this state that it now fails to adequately narrow the class of death-eligible defendants. More specifically, the appellant refers to several cases from this Court which (1) allow "torture" to include "severe mental pain," see State v. Williams, 690 S.W.2d 517 (Tenn. 1985); (2) allow a finding of torture without any intent on the part of the defendant to inflict torture or serious physical abuse beyond that necessary to produce death, see State v. Blanton, 975 S.W.2d 269 (Tenn. 1998); and (3) allow jurors to use their common knowledge and experience in finding that "physical and mental torture" was inflicted upon the victim, see State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998). Because of each of these "broadening constructions," the appellant argues, this aggravating circumstance "is applicable in virtually every first degree murder and fails to properly narrow that eligible for the death penalty." Again, we must disagree.

The very purpose of the consideration of aggravating circumstances within a scheme of capital punishment is to provide some principled guidance for the sentencing authority to choose between death and a lesser sentence. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 428-29 (1980); see also State v. Middlebrooks, 995 S.W.2d 550, 556 (Tenn. 1999). Although a court could interpret an aggravating circumstance so broadly that it would allow the jury unlimited discretion in imposing the death penalty, cf. State v. Wood, 648 P.2d 71 (Utah 1981), the test for constitutional infirmity is whether one could fairly conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, see Maynard v. Cartwright, 486 U.S. 356, 364 (1988) (invalidating aggravating circumstance that "an ordinary person could honestly believe" described every murder); Godfrey, 446 U.S. at 428-429 ("A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'"). We have consistently upheld the constitutionality of Tennessee Code Annotated section 39-2-203(i)(5) in the face of arguments that it applies to all defendants, and we have repeatedly rejected the contention that it is vague or overbroad. See, e.g., State v. Middlebrooks, 995 S.W.2d 550, 556 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998); State v. Black, 815 S.W.2d 166, 181 (Tenn. 1991). Although the appellant's argument today differs somewhat from those previously advanced in other cases, we reaffirm the constitutionality of the "especially heinous, atrocious, or cruel" aggravating circumstance.

First, it is clear that by defining "torture" to include "severe mental pain," this Court has not broadened the scope of the "especially heinous, atrocious, or cruel" aggravating circumstance so as to render it unconstitutional. In Walton v. Arizona, 497 U.S. 639 (1990), the United States Supreme Court upheld the application of Arizona's "especially heinous, cruel or depraved" aggravating circumstance. Although finding the wording of the circumstance facially vague, the Court nevertheless upheld its application because of the limiting constructions placed on the wording by the Arizona courts. One of the limiting constructions placed upon this aggravating circumstance was that the crime must have been "committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death." In upholding this circumstance as applied, the Walton Court expressly stated that a limiting construction which defines "mental anguish" to include "a victim's uncertainty as to his ultimate fate" passes constitutional muster. Id. at 654. In addition, several other states with a statutory aggravating circumstance virtually identical to our (i)(5) circumstance have held that the word "torture" necessarily includes "mental anguish" within its meaning.[2] Accordingly, we conclude that the inclusion of "severe mental pain" within the definition of "torture" has not rendered this aggravating circumstance unconstitutional.

Second, the fact that the statute does not require an intent on the part of the defendant to inflict torture or serious physical abuse upon the victim also does not broaden the scope of the (i)(5) aggravating circumstance so as to render it unconstitutional. We have repeatedly rejected this argument in the past, see State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 281 (Tenn. 1998); see also State v. Odom, 928 S.W.2d 18, 26 n.5 (Tenn. 1996), and we do so again today. Once again, we note that "[c]ircumstance (i)(5) does not require a mens rea. The aspect of torture focuses on the circumstances of the killing." Carter, 988 S.W.2d at 150.

The United States Supreme Court has never held that the "especially heinous, atrocious, or cruel" circumstance is unconstitutional in the absence of any mental requirement, and we conclude that the absence of a mental state does not render this circumstance constitutionally infirm in this state. Nothing in our statutes or cases, however, precludes consideration of the defendant's mental state in mitigation of sentence. In fact, Tennessee Code Annotated section 39-13-204(j)(9) specifically provides that the jury shall consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing." This broad catch-all provision necessarily includes consideration of the defendant's mens rea at the time the victim is tortured or receives serious physical abuse beyond that necessary to produce death. Cf. State v. Zaragoza, 659 P.2d 22, 27 (Ariz. 1983). In addition, before a jury may impose death, it must conclude that the aggravating circumstance or circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(g)(1). This calculus also necessarily includes consideration of the circumstances of the offense and the defendant's mental state at the time he or she inflicts torture or serious physical abuse upon the victim. Accordingly,

---

[2] See, e.g., Willett v. State, 983 S.W.2d 409, 411 (Ark. 1998) ("'Mental anguish' is defined as the victim's uncertainty as to his ultimate fate."); State v. Jackson, 918 P.2d 1038, 1047 (Ariz. 1996) ("Mental anguish includes a victim's uncertainty as to her ultimate fate."); State v. Spry, 973 P.2d 783, 791 (Kan. 1999) ("Mental anguish includes a victim's uncertainty as to [his] or [her] ultimate fate."); Neill v. State, 896 P.2d 537, 556 (Okla. Crim. App. 1994) ("Mental anguish includes the victim's uncertainty as to his ultimate fate.").

the fact that a mental state is absent from the "especially heinous, atrocious, or cruel" aggravating circumstance does not render this circumstance constitutionally infirm.

Finally, we reject the contention that allowing a jury to use its common sense, knowledge, and experience somehow renders the (i)(5) aggravating circumstance constitutionally infirm. As the United States Supreme Court has noted, this aggravating circumstance "is not susceptible to mathematical precision," Walton, 497 U.S. at 655, and so long as the jury is given some meaningful guidance in the sentencing process, it is anomalous to conclude that the jury cannot then reach its final determination through the use of its collective knowledge, experience, and common sense.[3] If the appellant did not wish to have a jury use its collective knowledge and common sense to determine an appropriate sentence in his case, we observe that procedures were available for him to request sentencing without a jury. See Tenn. Code Ann. § 39-13-205(b). A jury's ability to use its collective knowledge, experience, and common sense to assist in reaching a determination in these weighty and complex matters is the very strength of the jury system, not evidence of its frailty or unconstitutionality.

In summary, we hold that a rational jury could have found the (i)(5) aggravating circumstance beyond a reasonable doubt. The evidence was more than sufficient to establish that the murder was "especially heinous, atrocious, or cruel" in that it involved both torture and serious physical abuse beyond that necessary to produce death. Further, the trial court was not required to give an additional unanimity instruction as to the particular theory supporting this aggravating circumstance, because its general unanimity instruction with regard to the aggravating circumstances as a whole was adequate. Finally, interpretations of this Court have not expanded the meaning of the (i)(5) aggravating circumstance beyond constitutional bounds. We affirm the application of this aggravating circumstance to the appellant's case.

### C. Review of the Weighing of the Aggravating and Mitigating Circumstances

Having determined that a rational jury could have found the presence of two statutory aggravating circumstances beyond a reasonable doubt, we now undertake to determine whether the evidence supports the jury's finding that these aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. The jury did not indicate which, if any, of the fifteen mitigating circumstances submitted by the trial court was properly supported by the evidence, but in undertaking this analysis, we will presume that the jury found all fifteen mitigating circumstances were raised and supported by at least some evidence.

---

[3] This is also the very task that is expected of a jury in virtually all other aspects of capital sentencing, such as evaluating the presence and strength of any mitigating circumstances and even when making the final determination of punishment. Cf. State v. Nichols, 877 S.W.2d 722, 731 (Tenn. 1994) ("Once a capital sentencing jury finds that a defendant falls within the legislatively-defined category of persons eligible for the death penalty, the jury is free to consider a myriad of factors to determine whether death is the punishment appropriate to the offense and the individual defendant.") (citing California v. Ramos, 463 U.S. 992, 1005 (1983); Barclay v. Florida, 463 U.S. 939, 948 (1983); Zant v. Stephens, 462 U.S. 862, 878 (1983)).

Nevertheless, based upon our own review, we conclude that the jury could have rationally concluded that the two aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. Both aggravating circumstances were clearly present beyond a reasonable doubt and were properly considered by the jury. The evidence shows that the appellant secreted the victim away by driving her to a discrete and remote location. The appellant then violently raped and assaulted the victim, while manually strangling her with such force as to render her unconscious. Although the appellant argued that he was under extreme mental stress during his gruesome crime, the testimony of Mr. Wilson and others to the effect that the appellant appeared to be acting "normally" both before and after the murder, certainly weighs heavily against his position. Further, we are unable to say that the jury improperly weighed any evidence concerning the appellant's unfortunate childhood—or that it improperly weighed any evidence of depression, post-traumatic stress disorder, or attention deficit disorder—as there was no testimony, expert or otherwise, that any of these circumstances affected the appellant at the time of his offense or were otherwise responsible, directly or indirectly, for his behavior on March 17, 1990. Accordingly, we find that a rational jury could have concluded that both aggravating circumstances in this case outweighed any mitigating circumstances beyond a reasonable doubt.

## II. JURY INSTRUCTION ISSUES

The appellant raises two issues relating to the instruction of the jury during the sentencing phase. More specifically, he argues that the trial court erred in refusing to give an instruction on the sentence of life imprisonment without the possibility of parole and that the court erred in not submitting to the jury the appellant's special instruction with regard to circumstantial evidence. After reviewing the record and the applicable case law, we hold that the appellant's assignments of error are without merit.

### A. *Life Without the Possibility of Parole Instruction*

In 1993, the General Assembly amended the capital sentencing statutes to provide for the sentence of life imprisonment without the possibility of parole. See 1993 Tenn. Pub. Acts ch. 473. Section 16 of chapter 473 provides that "[t]his act shall take effect on July 1, 1993, the public welfare requiring it, and shall apply to all offenses committed on or after that date." The appellant argues that although his offense was committed before the effective date of the act—it was committed on March 17, 1990—he is nevertheless entitled to the instruction because his second sentencing hearing on remand occurred more than four years after the act was passed. The appellant also argues that the failure to instruct the jury on the punishment of life without parole violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections eight and sixteen of the Tennessee Constitution. For the reasons given herein, we hold that the appellant was not entitled to an instruction on life imprisonment without the possibility of parole and that such an instruction was not constitutionally required.

#### 1. Plain Language of 1993 Tenn. Pub. Acts ch. 473, section 16.

Before addressing the constitutional issues presented with respect to the propriety of this instruction, we first observe that the plain language of the statute applies only to cases in which the *offense* was committed after July 1, 1993, and therefore, the appellant was not statutorily entitled to the instruction. We have previously addressed this issue in State v. Cauthern, 967 S.W.2d 726, 734-36 (Tenn. 1998), in which we first held that the statutory language prohibited a jury from considering life without the possibility of parole as a sentencing option where the offense was committed before July 1, 1993. In denying the defendant relief on this basis, we first noted that according to the plain language of the statute, the instruction was not available to the defendant because his offense was committed "well before July 1, 1993." Id. at 735. We also held that the specific provisions of this act governed over the more general provisions of Tennessee Code Annotated sections 39-13-204(k) (Supp. 1996) and 39-11-112 (1991), which the defendant argued made the instruction a viable possibility for sentences imposed after July 1, 1993.[4] We concluded by finding "no indication that the legislature intended that the option of life without parole apply retrospectively to offenses occurring before July 1, 1993."

The appellant in this case argues that Cauthern cannot directly resolve this issue because the statute is ambiguous as to whether it applies to sentencing hearings occurring after the effective date of the act. As such, the appellant contends, any ambiguity should be weighed in favor of allowing the life without parole instruction. We disagree. First, the statute is not ambiguous. Although the statute does not mention sentencing hearings specifically, the statute is clear that it applies only to *offenses* committed on or after that date. We will not construe the plain, unambiguous language of the statute to give "any forced or subtle construction which would extend or limit its meaning." State v. Butler, 980 S.W.2d 359, 362 (Tenn. 1998); see also State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997).

Second, as evidenced by Tennessee Code Annotated section 40-35-117(b) (1997), the General Assembly could have drafted the statute so as to apply the life without parole instruction to sentencing hearings if it had so desired. In stark contrast to the language of the statute at issue in this case, the language of section 40-35-117(b) specifically states that "[u]nless prohibited by the United States or Tennessee constitution, any person *sentenced* on or after November 1, 1989, for an offense committed between July 1, 1982 and November 1, 1989, shall be sentenced under the provisions of this chapter [the 1989 Criminal Sentencing Reform Act]." (emphasis added). We have recently reaffirmed that this language requires sentencing according to the 1989 Act, absent any violation of due process, even if the offense was committed before the effective date of the act. See McConnell v. State, 12 S.W.3d 795 (Tenn. 2000). Because the General Assembly has demonstrated its ability to draft statutes that apply sentencing changes to sentencing hearings, its failure to do so in this case must work against allowing the appellant to receive the life without parole instruction.

---

[4] As we stated in Cauthern, Tennessee Code Annotated section 39-13-204(k) provides that if a defendant is granted a new trial, "either as to guilt or punishment or both, the new trial shall include the possible punishments of death, imprisonment for life without possibility of parole or imprisonment for life." Because this section was enacted as part of the same public act providing for the life without parole instruction, this provision is also governed by the act's effective date as set forth in section 16.

-16-

Having reviewed our discussion of this issue in Cauthern, we see no justification to depart from the reasoning of that case.[5] The plain language of the statute permits the life without parole instruction to be given only in cases in which the *offense* was committed after July 1, 1993. The importance of the use of this language is reinforced by the fact that the corresponding language of the 1989 Criminal Sentencing Reform Act applies to all *sentences* imposed after its effective date. We further note that the General Assembly has made no effort to amend the life without parole statute since Cauthern to correct any apparent misunderstanding. Accordingly, we hold that the appellant was not entitled to receive an instruction on the punishment of life without the possibility of parole according to the plain language of the statute.

## 2. Evolving Standards of Decency

The appellant next argues that the failure to give a life without the possibility of parole instruction violates the federal and Tennessee Constitutions because it is contrary to society's "evolving standards of decency." As evidence that the life without parole instruction is part of the evolving standards of decency, the appellant cites this state's adoption of the instruction in 1993 as well as the fact that "of the thirty-eight states that currently have capital punishment schemes, at least thirty-five give the sentencing body the option of imposing life imprisonment without parole in lieu of a death sentence." The appellant also cites opinion polls and the purported practice of sentencing juries as further evidence of the nation's evolving standards of decency. Accordingly, Tennessee's own evolving standards of decency, the appellant argues, "mandate that the sentencing option [of life without parole] be given when requested in all sentencing hearings after the Act's effective date." Again, we must disagree.

A review of the federal case law on the application of the Eighth Amendment's "evolving standards of decency" doctrine reveals that doctrine provides both substantive and procedural protections against the imposition of cruel and unusual punishments. The substantive part of this doctrine ensures that no type of punishment will be inflicted that is "inhuman and barbarous," see Weems v. United States, 217 U.S. 349, 368 (1910), or that is "excessive [in] length or severity, [or] greatly disproportioned to the offenses charged," id. at 371 (citing O'Neil v. Vermont, 144 U.S. 323 (1892)). The substantive protections of the "evolving standards of decency" doctrine in capital cases may be seen in the following cases from the United States Supreme Court, in which certain types of executions were held to constitute cruel and unusual punishment: Thompson v. Oklahoma, 487 U.S. 815 (1988) (holding that the death penalty may not be imposed on persons fifteen years of age or younger); Ford v. Wainwright, 477 U.S. 399, 406 (1986) (prohibiting the execution of mentally incompetent persons); Coker v. Georgia, 433 U.S. 584, 592 (1977) (holding that a defendant

---

[5] We also note that the procedural history of Cauthern is virtually identical to that of the present case, a fact which strengthens our conclusion that Cauthern should control the outcome of this case. In Cauthern, the defendant was first convicted of first degree murder and sentenced to death in 1988. On automatic appeal, this Court affirmed the conviction but remanded the case for resentencing. The defendant was again sentenced to death at a second sentencing hearing, which occurred at some point after the life without possibility of parole instruction took effect on July 1, 1993. On a second automatic appeal to this Court, the Cauthern defendant argued that because his resentencing took place after the effective date of the act, he was entitled to the life without parole instruction.

-17-

convicted of rape, without more, cannot be given the death penalty); and Tison v. Arizona, 481 U.S. 137 (1987) (limiting death eligibility based on accomplice liability).

Beginning with Gregg v. Georgia, 428 U.S. 153 (1976), the Eighth Amendment's prohibition against cruel and unusual punishment also took on a *procedural* aspect to ensure that the death penalty was not, in the words of Potter Stewart, "wantonly" or "freakishly" imposed.[6] Gregg stated that "the concerns expressed in Furman [v. Georgia] that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." 428 U.S. at 195. Since Gregg, these procedural aspects of the Eighth Amendment's evolving standards of decency doctrine have focused on ensuring that the system used to impose death is not one "of standardless jury discretion." Id. at 428 U.S. 153, 195 n.47. A review of the case law reveals that these procedural issues generally arise in two areas: (1) issues related to the channeling of the jury's discretion to impose death, see Walton v. Arizona, 497 U.S. 639 (1990); Maynard v. Cartwright, 486 U.S. 356 (1988); Godfrey v. Georgia, 446 U.S. 420 (1980); and (2) issues related to the notion of individualized sentencing and consideration of mitigating evidence, see Eddings v. Oklahoma, 455 U.S. 104, 115 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978). As these cases demonstrate, so long as the system used to impose death is not rendered arbitrary or capricious in that the sentencing authority lacks adequate information or guidance, the procedural protections of the Eighth Amendment in capital cases have no application.

Although the appellant argues that the failure to give an instruction regarding the punishment of life without the possibility of parole violates the "evolving standards of decency" doctrine, he has failed to show that his ineligibility for this instruction has rendered the Tennessee system of capital punishment arbitrary or capricious, or has in any way precluded the jury from considering his individual circumstances or the nature of his crime. For despite his ineligibility for the life without parole instruction, the appellant was given a full and fair opportunity to present to the jury evidence in mitigation of sentence, and from all indications, the jury carefully considered and weighed the mitigating evidence before imposing death. This instruction has never been required by the Eighth Amendment in capital cases, and we conclude that its absence in this case certainly did not turn otherwise constitutional procedures into ones infected with standardless discretion.

The appellant argues that, given the option, juries in Tennessee have sentenced defendants to life without parole more times than they have imposed death. He draws from this statistic that "the reliability of death sentences actually imposed subsequent to inclusion of the life without parole option has been enhanced." Once again, though, the focus of the Eighth Amendment—and of Article I, section sixteen—is on the capital sentencing process as a whole. Simply stated, we can little see how the absence of this instruction has rendered the process so unreliable, or so arbitrary and capricious, as to violate the ban on cruel and unusual punishments. The jury in this case still

---

[6] See Furman v. Georgia, 408 U.S. 238, 310 (1972) (Stewart, J., concurring in judgment) ("I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.").

heard all of the appellant's evidence presented in mitigation of sentence, and the jury was given constitutionally acceptable instruction and guidance as to the use of that evidence. Moreover, the jury independently considered and weighed this evidence against the two aggravating circumstances it found beyond a reasonable doubt, and it unanimously concluded that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. We simply are unable to conclude that the process by which the appellant was sentenced to death for his crimes was the result "of standardless jury discretion," even without the life without parole instruction. Neither the Eighth Amendment, nor Article I, section 16, requires anything more. Cf. Lockett, 438 U.S. at 605.[7]

### 3. The Need for Incapacitation

The appellant next argues that the life without parole instruction should have been given because death is in excess of that reasonably needed for incapacitation of the offender. Neither our statutes nor our case law has ever rested the overall philosophical justification for the death penalty upon the need for incapacitation. Rather, it is well recognized that the only two penological goals served by capital punishment are retribution and general deterrence of crime. See State v. Black, 815 S.W.2d 166, 190 (Tenn. 1991); see also State v. Middlebrooks, 840 S.W.2d 317, 340 (Tenn. 1992) (citing Gregg v. Georgia, 428 U.S. at 183). In fact, our research has uncovered no Tennessee case in which incapacitation has even been cited as a legitimate penological goal supporting the death penalty, no doubt for the very reasons cited by the appellant.

In response, the appellant argues that even though incapacitation may not be a legitimate goal of capital punishment generally, "social science data indicate that it is reasonably likely that jurors return death sentences solely to prevent a defendant's release into the community." However, the appellant provides no support for this assertion, and even if taken as true, we see no indication from the record of this case that the appellant was sentenced to death by the jury, in whole or in part, for incapacitative reasons. The district attorney did not argue that the appellant needed to be incapacitated or removed from society, and the judge certainly gave no such instruction allowing incapacitation to be considered. Accordingly, we conclude that the appellant was not entitled to a life without parole instruction on the basis that juries impose death for reasons of incapacitation.

---

[7] Having concluded that neither the federal nor Tennessee Constitutions requires an instruction on life without parole—because its absence does not hinder the presentation, consideration, or weighing of mitigating evidence, or otherwise render the proceedings arbitrary and capricious—we find unpersuasive the appellant's argument that the instruction is required because most other states which have the death penalty also permit the life without parole instruction. We note that other states have not uniformly required the new instruction to take effect at sentencing hearings occurring after the effective date of the statute. At least two states other than Tennessee require that the life without parole instruction be given only when the *offense* was committed after the effective date of the act, see State v. Alcorn, 638 N.E.2d 1242, 1246 (Ind. 1994); Booth v. State, 608 A.2d 162, 173-174 (Md. 1992), and at least one state allows the instruction only if the *conviction* occurs after the effective date of the act, see Salazar v. State, 852 P.2d 729, 740 (Okla. Crim. App. 1993). As the life without parole instruction is not constitutionally required in any scheme of capital punishment, the General Assembly was within its prerogative to apply the instruction only to offenses committed after July 1, 1993.

### 4. Equal Protection

Last, the appellant argues that he has been denied the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution, because other defendants, whose crimes were committed before July 1, 1993, have received a life without parole instruction. Even if correct, the appellant has succeeded only in showing that others similarly situated have been treated differently. A successful equal protection claim, however, also requires a showing that the decision not to give a life without parole instruction "ha[d] a discriminatory effect and that it was motivated by a discriminatory purpose." Cf. United States v. Armstrong, 517 U.S. 456, 465 (1996); see also McCleskey v. Kemp, 481 U.S. 279, 292 (1987); State v. Irick, 762 S.W.2d 121, 129 (Tenn. 1988). There is no indication in this record that the decision not to instruct the jury on the punishment of life without parole was the result of any discriminatory purpose. Rather, it appears by all accounts that the trial court's actual reason for not instructing the jury on life without parole was because the court believed it had no jurisdiction to do so. This legitimate reason does not provide us with a sufficient basis to find discriminatory intent, and the appellant's assignment is accordingly overruled.

### B. Instruction on Circumstantial Evidence

In the final assignment of error, the appellant argues that the trial court incorrectly instructed the jury with regard to consideration of circumstantial evidence, because the instruction contained no information on how the jury was to weigh and consider circumstantial evidence. The instruction given by the trial court was as follows:

> Any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by both combined.
>
> Direct evidence is defined as evidence which proves the existence of the fact in issue without inference or presumption. Direct evidence may consist of testimony of a person who has perceived by the means of his or her senses the existence of a fact sought to be proved or disproved.
>
> Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred.

The appellant, on the other hand, specifically requested that the following special instruction be charged:

> When evidence of a fact required to be proved is made up entirely of circumstantial evidence, then before you would be justified in finding the fact required to be proved, you must find that all of the essential facts are consistent with the finding of the fact

required to be proved, and the facts must exclude every other reasonable theory except that of the fact required to be proved.

The State argues before this Court that the appellant was not entitled to his proposed instruction because the proof of the two aggravating circumstances was not made up entirely of circumstantial evidence. We agree with the State that the evidence supporting the (i)(1) aggravating circumstance was established from the testimony of witnesses with personal knowledge, and is therefore composed entirely of direct evidence. We agree with the appellant, however, that the evidence supporting the torture prong of the (i)(5) aggravating circumstance, was composed entirely of circumstantial evidence, as the jury had to infer from other evidence presented to them that Nikki suffered severe mental and physical pain.[8] Consequently, the trial court was required to instruct the jury on the weighing of circumstantial evidence. Cf. State v. Thompson, 519 S.W.2d 790, 792 (Tenn. 1975). Although the instruction given by the trial court addressed the nature of circumstantial evidence generally, the instruction did not provide guidance on how the jury was to find a fact of consequence solely from circumstantial evidence. Cf. Monts v. State, 379 S.W.2d 34, 41 (Tenn. 1964). Hence, we conclude that the trial court committed error in not granting the appellant's request for a special instruction on circumstantial evidence.

Nevertheless, we conclude that this error was harmless as the error does not appear to have affirmatively affected the outcome of the sentencing hearing. See Tenn. R. Crim. P. 52(a); cf. State v. Hall, 958 S.W.2d 679, 695 (Tenn. 1997) (applying Rule of Criminal Procedure 52(a) to trial court's refusal to give instructions on non-statutory mitigating circumstances). The instruction proposed by the appellant would have required the jury to make two specific findings before a more general finding of torture was justified: (1) that all of the essential facts presented were consistent with the victim suffering severe mental or physical pain; and (2) that the facts presented must have excluded every other reasonable theory except that the victim suffered severe mental or physical pain. When phrased in terms of the appellant's proposed instruction, we conclude the jury would still have found that Nikki was tortured through infliction of severe mental or physical pain. The evidence presented to the jury was certainly consistent with the fact that Nikki was extremely concerned about her own physical safety in the terrifying moments before she lost consciousness, and that she was in extreme physical pain as she was strangled so forcefully that she turned blue and lost consciousness. Moreover, the evidence does in fact exclude every other reasonable theory except that the child suffered extreme mental and physical pain, and the record contains no evidence whatsoever that would serve to contradict this finding. Accordingly, although we find technical error in failing to grant the appellant's special request for a jury instruction, we also conclude that because the error does not affirmatively appear to have affected the outcome of the sentencing hearing, this error does not warrant reversal of the sentence.

---

[8] We note, though, that the evidence supporting the serious physical abuse prong of the (i)(5) circumstance is established by the appellant's own statements, and is therefore comprised only of direct evidence. Because we have already concluded that the jury could have possibly found the (i)(5) aggravating circumstance based solely on the torture prong, however, we conclude that the appellant was entitled have the jury instructed according to his special instruction.

The appellant suggests that the error was not harmless because the jury was then required to weigh the finding of torture or serious physical abuse against any mitigating circumstances and then conclude that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. The appellant does not dispute, however, that the jury was properly instructed on its duty to find the aggravating circumstance beyond a reasonable doubt and on the proper weighing of aggravating and mitigating circumstances. As we concluded previously, a rational jury could have concluded that this aggravating circumstance was present beyond a reasonable doubt and that both aggravating circumstances in this case outweighed any mitigating circumstances beyond a reasonable doubt. Accordingly, any error in instructing the jury on the finding of a fact based upon circumstantial evidence was harmless.

### III. COMPARATIVE PROPORTIONALITY REVIEW[9]

Pursuant to Tennessee Code Annotated section 39-13-206(c)(1), "this Court conducts a comparative proportionality review of every death sentence for the purpose of 'determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime.'" State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000) (quoting State v. Hall, 8 S.W.3d 593, 604 (Tenn. 1999)). This Court applies the precedent-seeking approach, in which we compare a particular case with other cases in which the defendants were convicted of the same or similar crimes. We conduct this comparison by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating circumstances involved. See State v. Bland, 958 S.W.2d 651, 664 (Tenn. 1997). The purpose of this analysis is to identify arbitrary, or capricious sentences by determining whether the death penalty in a given case is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Henderson, 24 S.W.3d at 315 (quoting Bland, 958 S.W.2d at 662). A death sentence will be considered disproportionate if the case, taken as a whole, is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Bland, 958 S.W.2d at 665.

Our first task in conducting comparative proportionality review is to identify the pool of similar cases—which includes all cases in which the defendant is convicted of first-degree murder and in which a capital sentencing hearing was actually conducted—to which we compare the appellant's case. See Bland, 958 S.W.2d at 666. After identifying a pool of similar cases, "we consider a multitude of variables, some of which were listed in Bland, in light of the experienced judgment and intuition of the members of this Court." See Cribbs, 967 S.W.2d at 790. Selection of similar cases from the general pool is, of course, not an exact science, because no two cases are identical with respect to either circumstances or defendants.

---

[9] We note that this Court previously conducted a comparative proportionality review of this case when we first heard the case on automatic appeal in 1994. See State v. Keen, 926 S.W.2d 727, 744 (Tenn. 1994). Nevertheless, since that time, we have further elaborated on the procedures governing proportionality review, see State v. Bland, 958 S.W.2d 651 (Tenn. 1997), and we therefore again conduct a comparative proportionality review to ensure that the capital sentence imposed in this case is not "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." Bland, 958 S.W.2d at 665.

With respect to the nature and circumstances of the offense, the relevant factors considered by this Court include, but are not limited to: (1) the means of death; (2) the manner of death, such as whether the death was violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims.

With respect to comparing the characteristics of the defendants, the following factors were listed in <u>Bland</u> as relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Of course, these factors are not exhaustive, and this Court may consider other factors in comparing the characteristics of the appellant with other defendants in the pool of cases.

In this case, the victim was an eight-year-old Caucasian female, who was murdered by ligature strangulation after forcible rape and manual strangulation. The offense was facilitated by an abuse of a position of trust, and the murder involved torture as well as serious physical abuse beyond that necessary to produce death. Separate and apart from the serious physical abuse resulting from the manual strangulation, substantial evidence exists that the victim was repeatedly assaulted prior to her death. The motivation of the appellant in killing the victim is unclear from the record, but there can be no dispute that death was intended and that it was brought about in the absence of any conceivable provocation or justification. The victim, who weighed only 68 pounds, was rendered helpless by the appellant during her rape and murder.

The appellant is a Caucasian male, who was 27-years-old at the time of the murder, and who has no significant record of criminal history. The appellant does appear to have some history of mental disorder, although the appellant's psychologist indicated a slight possibility that the appellant had manipulated the testing results to achieve this finding. Moreover, no testimony, expert or otherwise, established any causal link between these disorders and the appellant's crime. The appellant was the lone perpetrator of the crime, and although he later confessed to the crime and pleaded guilty to the murder, he deliberately deceived and misled the police detectives during the early stages of the investigation. The appellant's psychologist testified that the appellant expressed significant feelings of shame and remorse. Finally, because the appellant made repeated references to the fact that Nikki was "blue" and "not breathing," it is clear that the appellant was well aware of the helplessness of the victim before he strangled her with a shoelace. We see no indication from the record of a strong likelihood for rehabilitation.

In <u>State v. Coe</u>, 655 S.W.2d 903 (Tenn. 1983), the defendant was convicted of the intentional killing of an eight-year-old female victim. The defendant lured the victim away under false pretenses, secreted her to a discrete and isolated location, raped her, manually strangled her, and then

stabbed her in the throat.  The jury found the presence of the (i)(1), (i)(5), (i)(6), and (i)(7) aggravating circumstances, and in mitigation, the defendant presented evidence that he had a dysfunctional family history, which included sexual abuse of siblings committed by his father. Furthermore, like the appellant in this case, the defendant in Coe was previously institutionalized for mental problems and various personality disorders.  The jury imposed the sentence of death, which this Court affirmed.

In State v. Vann, 976 S.W.2d 93 (Tenn. 1998), the defendant was convicted of murder in the perpetration of the rape of his eight-year-old daughter.  Like the present case, the cause of death in Vann was determined to be ligature strangulation.  The defendant presented mitigation evidence to the effect that he came from impoverished background, had nervous breakdowns, was addicted to medication, suffered physical abuse from his father, and was hospitalized for depression and suicidal tendencies.  The jury imposed the death sentence after finding the presence of the (i)(1), (i)(2), and (i)(5) aggravating circumstances.  This Court affirmed the convictions and sentence.

In State v. Irick, 762 S.W.2d 121 (Tenn. 1988), the defendant was convicted of felony murder and two counts of aggravated rape of a seven-year-old female victim.  The defendant was a close friend of the victim's mother, and he was entrusted to watch over the victim one evening while her mother was at work.  During this time, the defendant brutally raped the victim and later killed her. The cause of death was asphyxiation and suffocation.  The defendant was twenty-six years old with no prior criminal history, and he had been institutionalized for mental treatment before his crime. The defendant knew the victim, and he abused his position of trust to facilitate the crime.  The jury imposed the sentence of death after finding the (i)(1), (i)(5), (i)(6), and (i)(7) aggravating circumstances beyond a reasonable doubt.  This Court affirmed the defendant's conviction and sentence of death.

In State v. Teel, 793 S.W.2d 236 (Tenn. 1990), the defendant admitted to the rape and murder of a fourteen-year-old victim.  The evidence established that the defendant drove the victim, a person with whom he was well acquainted, to a remote and secluded location by telling her that he was taking her to see her boyfriend.  Once there, he forced her to perform fellatio and then vaginally raped her.  The cause of death was some type of "neck trauma" consisting of either manual strangulation, ligature strangulation, or a blow or cut to the neck.  The jury found the presence of the (i)(5) and (i)(7) aggravating circumstances, and the sentence of death was affirmed by this Court.

Several other cases in which death was imposed, though not as similar as the four preceding cases, also share significant and substantial similarities to the present case, both in terms of the nature of the crime and in the circumstances of the defendant: State v. Cauthern, 967 S.W.2d 727 (Tenn. 1998) (finding the presence of the (i)(5) aggravating circumstance in the rape and murder of the victim, who died from ligature strangulation); State v. Hodges, 944 S.W.2d 346 (Tenn. 1997) (finding the (i)(5) aggravating circumstance in the strangulation murder of victim and imposing death despite fact that defendant exhibited antisocial personality disorder and was raped as a child); State v. Hines, 919 S.W.2d 573 (Tenn. 1995) (finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances, and imposing death despite evidence that defendant had a troubled childhood, was

abandoned by his parents, had abused drugs and alcohol as teenager, and suffered from self-destructive behavior, paranoid personality disorder, dysthymia, and chronic depression); State v. Shepherd, 902 S.W.2d 895 (Tenn. 1995) (finding the (i)(2), (i)(5), and (i)(7) aggravating circumstances in the rape and murder of sixteen-year-old victim, and imposing death despite fact that defendant came from impoverished family, was emotionally scarred as child, and was previously admitted to a mental health facility); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (finding the (i)(5), (i)(6), (i)(7), (i)(12) aggravating circumstances, and imposing death despite fact that defendant had been hospitalized for depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder).

We have also located three cases that are similar to the appellant's case in which the death sentence was not imposed. See State v. James Lloyd Julian, No. 03C01-9511-CR-00371, 1997 WL 412539 (Tenn. Crim. App. filed at Knoxville, July 24, 1997); State v. Paul Ware, No. 03C01-9705-CR-00164 (Tenn. Crim. App. filed at Knoxville, April 20, 1999); see also State v. John Edward Allen, Shelby County, *cited in* Vann, 976 S.W.2d at 109. In Ware and Allen, however, the proof did not show that the defendant was either acquainted with the victim or abused a position of trust. In addition, the defendants in Ware and Julian were apparently under the influence of an intoxicant at the time of the crimes. By way of contrast, the appellant in this case was not under the influence of any foreign substance at the time of his crime, and it is a reasonable inference from the evidence that the appellant's crime was intentional. In addition, there is some evidence that the psychological testing and evaluations of the appellant were not reliable, either because the appellant "faked" or otherwise exaggerated the test results.

A sentence of death is not disproportionate, however, merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. State v. Smith, 993 S.W.2d 6, 17 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 281 (Tenn. 1998); Bland, 958 S.W.2d at 665 (citing State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986)). As we have stated many times before, "the isolated decision of a jury to afford mercy does not render a death sentence disproportionate." State v. Smith, 993 S.W.2d 6, 21 (Tenn. 1999); see also Gregg v. Georgia, 428 U.S. 153, 203 (1976). Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Blanton, 975 S.W.2d at 281; see also Bland, 958 S.W.2d at 665. Instead, our duty "is to assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665.

In conducting this proportionality review, we have tried to identify cases from the comparative pool in which the defendant raped and murdered children or young victims. We looked for cases in particular in which the (i)(1) and (i)(5) aggravating circumstances were present and in which similar mitigating circumstances were raised by the evidence. We also searched for cases in which the defendant either was well acquainted with the victim or abused a position of trust to facilitate the crime. Based on our review of these several cases in which the death penalty was upheld, we are unable to say that the appellant's case, taken as a whole, is plainly lacking in circumstances that have previously justified death sentences. Accordingly, we hold that the death sentence imposed in this case was neither disproportionate nor arbitrarily applied.

The dissent concludes that because of perceived shortcomings in our comparative proportionality review protocol, the death sentence in this case—and perhaps in all cases—should be set aside. The dissent apparently mischaracterizes the purpose of comparative proportionality review, as proportionality review is not the sole method by which we determine that a death sentence has been randomly or arbitrarily imposed. Indeed, the entire system of capital punishment in Tennessee is composed of extensive procedures which work to eliminate arbitrary imposition of death by ensuring that the sentencing authority is given sufficient information and guidance in making its decision.

Without attempting to provide a comprehensive review of our capital procedures, we note that in our system of capital punishment as set forth in our statutes and rules, the defendant, if indigent, is afforded effective assistance of counsel by the state in the guilt and sentencing phases, as well as for both automatic appeals; the defendant receives notice in advance of the state's intention to seek the death penalty; the sentencing process is separated from the determination of the defendant's guilt; the defendant receives notice of the statutory aggravating circumstances upon which the state intends to rely in seeking death; the state and the defendant are both allowed to introduce proof and testimony relevant to punishment, which are not strictly subject to the rules of evidence; the defendant is permitted a fair opportunity to rebut any hearsay evidence presented by the state; the sentencing jury is given sufficient oral and written guidance, in the form of defined statutory aggravating circumstances, to consider the information presented; the jury is instructed that it may consider any additional mitigating circumstances raised by the evidence, whether raised during the guilt or sentencing hearing; the jury is instructed that it must unanimously agree that at least one aggravating circumstance is present and has been proven by the state beyond a reasonable doubt; the jury is instructed that it must unanimously agree that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt; and every juror must sign his or her name to the verdict form.

In addition, the defendant's conviction and sentence are reviewed by the Court of Criminal Appeals, irrespective of whether the defendant transmits the record. Tenn. Code Ann. § 39-13-206(a)(2). If the Court of Criminal Appeals affirms the conviction and sentence, then the case is automatically docketed in this Court for review. Both appellate courts first review errors assigned by the defendant alleged to have occurred during the guilt phase. Each appellate court then reviews the evidence supporting the aggravating circumstance and whether evidence supports the jury's determination that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt.

Every one of the procedures is designed to prevent the random or arbitrary application of the death penalty. The sentencing authority is given adequate information so as to insure individualized sentencing, and the discretion of the sentencing authority is properly and adequately channeled through oral and written instruction on defined aggravating circumstances. It is through use of these extensive procedural hurdles—and not only through comparative proportionality review—that the system of capital punishment in Tennessee works to eliminate unfettered discretion and arbitrary imposition of death.

It is *in addition* to all of these heightened protections against random death sentences that we have instituted a review procedure to serve as a final check against arbitrary imposition of the death penalty. Proportionality review is not the sole, or even the constitutionally necessary, protection against imposition of arbitrary death sentences, and a death sentence may be presumed to be proportionate where "it is imposed under a system which furnishes sufficient guidance to the sentencer through constitutionally valid aggravating and mitigating circumstances." Bland, 958 S.W.2d at 663 (citing McClesky v. Kemp, 481 U.S. 279, 306-08 (1987)).

Nevertheless, this Court has long believed that comparative proportionality review is an important component of our scheme of capital punishment, and we are constantly seeking methods by which to improve our review. Interestingly, while the dissent denounces the frailties of proportionality review, it does not cite to any example in which our review in this case has failed to expose the appellant's sentence as arbitrary or irrational. The dissent states that the comparative pool of cases is generally too small, but it has not suggested that we look to one single other case which would identify the appellant's sentence in this case as arbitrary or irrational. We look only to cases in which the death penalty was sought and a sentencing hearing was held "because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses." Id. at 666. As such, "the only cases that could be deemed similar . . . are those in which imposition of the death penalty was properly before the sentencing authority for determination." Id. The dissent does not state with specificity why any other cases are "equally relevant" to proportionality review, and we cannot agree that limitation of the pool to similar cases in which the death penalty was actually sought renders the review process practically useless.

The dissent also suggests that our review procedures are too subjective, but again, it does not suggest any method by which the procedures could be made more objective. We have followed the specific criteria as set forth in Bland, and we have objectively identified the types of cases used in our review with great specificity. While we have admittedly been guided by the unique facts in this case in conducting our review, this fact does not render the process too subjective. Without some sort of flexibility to consider unique facts and circumstances, the fundamental notion of individualized sentencing is lost.

Finally, the dissent states that the test for review is so broad that nearly any sentence could be found to be proportionate. To the contrary, we have narrowly tailored our proportionality review—as we have done in every case—to those factors which are specifically raised by the evidence. Because of the myriad of procedures in place to identify and eliminate arbitrary death sentences, it should come as no surprise that this Court has yet to reverse a case based solely on the proportionality review. The fact remains that this Court has reversed numerous death sentences for problems in evidence or proof supporting the conviction or sentence, and in this manner, we have also protected against arbitrary imposition of death. Indeed, we would remind the dissent that the appellant's original sentence was one such case, as it was initially reversed for inadequate jury instructions.

At the end of the day, the dissent's conclusion that the appellant's sentence be reversed solely for perceived defects in our proportionality review procedures makes little practical sense. The dissent cannot say with any certainty that its problems with the review procedure work to enshroud arbitrary sentences which are indiscoverable by the other procedural protections of the system. Without *some* evidence that the sentence in this case was arbitrarily imposed or was the result of unfettered discretion, we decline to reverse the sentence of death in this case based solely on conjecture and speculation.

## CONCLUSION

In summary, we affirm the sentence of death imposed by a Shelby County jury after a careful and extensive review of the record of the sentencing hearing in this case, the briefs and arguments of the parties, and the applicable legal authority. The two aggravating circumstances found by the jury are amply supported by the evidence, and we agree that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. The appellant was not entitled to an instruction on the possible punishment of life imprisonment without possibility of parole because his offense was committed before the effective date of the act, and we find no constitutional impediment to the General Assembly's discretion in this regard. Although we have found technical error in the jury instruction regarding the weighing of circumstantial evidence, we hold that the error did not affirmatively affect the outcome of the hearing given that the jury could not have arrived at a contrary conclusion using the appellant's proposed instruction. Finally, we have compared the nature of the crime and the circumstances of the appellant with other cases in which the death penalty has been imposed and affirmed, and we have concluded that the sentence of death was neither arbitrarily nor disproportionately applied in this case.

With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge David G. Hayes and joined by Judges Joe G. Riley and John Everett Williams. The relevant portions of that opinion are attached as an appendix to this opinion. The judgment of the Court of Criminal Appeals is affirmed.

It appearing from the record that the appellant is indigent, costs of this appeal are assessed to the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE

**APPENDIX**

**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
JANUARY SESSION, 1999**


| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **No. 02C01-9709-CR-00365** |
| **Appellee** | ) | |
| | ) | **SHELBY COUNTY** |
| **vs.** | ) | |
| | ) | **Hon. John P. Colton, Jr., Judge** |
| **DAVID M. KEEN,** | ) | |
| | ) | **(Sentencing)** |
| **Appellant** | ) | |
| | | **FIRST DEGREE MURDER, CAPITAL CASE** |


For the Appellant:

**W. Mark Ward**
Asst. Shelby Co. Public Defender
201 Poplar Avenue, Suite 2-01
Memphis, TN  38103


**A C Wharton, Jr.**
Public Defender

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Michael E. Moore**
Solicitor General

**Kenneth W. Rucker**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493


**William L. Gibbons**
District Attorney General

**Thomas D. Henderson** and
**Ms. Alonda Horne**
Asst. District Attorneys General
Criminal Justice Complex, Suite 301


-29-

201 Poplar Avenue
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED

## OPINION

In this capital case, the appellant, David M. Keen[1], appeals as of right the imposition of his sentence of death by a Shelby County jury following his guilty plea to first degree murder in the perpetration of rape.[2]  In his direct appeal to the supreme court, see State v. Keen, 926 S.W.2d 727 (Tenn. 1994), the appellant's conviction was affirmed; however, the court reversed the sentence of death due to invalid jury instructions.  The appellant's case was remanded to the Criminal Court of Shelby County for a resentencing hearing at which he again received the death penalty.

On appeal, the appellant raises the following issues:[3]

I.  Whether the trial court erred in denying the appellant's request to allow the jury to consider the sentencing option of life without parole;

II.  Whether the trial court erred by not informing the jury that the appellant would have been eligible for parole after serving 25 years of a sentence of life imprisonment;

III.  Whether the evidence is sufficient to support the especially heinous, atrocious, or cruel aggravating circumstance pursuant to Tenn. Code Ann. § 39-13-204(i)(5);

IV.  Whether the (i)(5) jury instruction which charged in the disjunctive "torture or serious physical abuse" denied the appellant his constitutional right to a unanimous jury verdict and whether the instruction failed to narrow the class for death eligibility;

---

[1]  At the time of the offense the appellant was twenty-seven years old.

[2]  The appellant's guilty plea was entered on February 12, 1991.  Although the record does not contain a copy of the guilty plea, apparently the appellant also pled guilty to aggravated rape.  However, the appellant does not challenge this conviction in this instant appeal.

[3]  Contained within the appellant's twelve general issues are other specific allegations of error set forth as sub-issues.

V. Whether the trial court erred by refusing the appellant's special request instruction for the especially heinous, atrocious, or cruel aggravating circumstance and the special request instruction regarding circumstantial evidence;

VI. Whether the trial court erred in denying the appellant's motion to instruct the jury that it could consider sympathy based on the evidence presented as a mitigating circumstance;

VII. Whether the prosecution exercised its peremptory challenges in a racially discriminatory manner;

VIII. Whether the trial court erred in refusing individual voir dire as to the prospective jurors' exposure to pre-trial publicity and as to the jurors' beliefs and attitudes about the death penalty;

IX. Whether the appellant was prejudiced by the State's introduction into evidence of a photograph of the victim taken during her lifetime and a morgue photograph of the victim;

X. Whether the trial court erred in allowing the State to make victim impact references during its closing argument;

XI. Whether Tennessee's death penalty statutes are constitutional;

XII. Whether the jury imposed an arbitrary and disproportionate sentence.

After a careful review of the briefs and record in this appeal, we affirm the judgment of the trial court.

## RESENTENCING HEARING [DELETED]

### I. Life without Parole Instruction [DELETED]

### II. Failure to Inform Jury of Parole Eligibility in Twenty-Five Years

The appellant asserts that the trial court's failure to inform the jury that he would be required to serve twenty-five years for a life sentence violated his federal and state constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution and Article I §§ 8 and 16 of the Tennessee Constitution. Also, he argues that the omission of such an instruction violates due process under Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187 (1994). Specifically, he contends that such an omission allows the jury to speculate and underestimate the amount of time a defendant must serve.

In essence, this appellant invites us to overrule our supreme court which we are unable to do. See Keen, 926 S.W.2d at 738; Smith, 857 S.W.2d at 11; Bates, 804 S.W.2d at 881-82. Regarding the extension of due process under *Simmons*, we decline the appellant's invitation for the same reason. See Bush, 942 S.W.2d at 502-503; State v. Caughron, 855 S.W.2d 526, 543 (Tenn. 1993); State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990), aff'd, 501 U.S. 808, 111 S.Ct. 2597 (1991). Accordingly, the issue is without merit.

### III. Sufficiency of the Aggravating Circumstance [DELETED]

### IV. Heinous, Atrocious, or Cruel Jury Instruction [DELETED]

### V. Special Request Instructions [DELETED]

### VI. Sympathy Instruction

The appellant challenges the trial court's denial of the appellant's motion to instruct the jury that it could consider sympathy as established by the proof as a mitigating circumstance citing Parks v. Brown, 860 F.2d 1545 (10th Cir. 1988). He cites no authority from this state on this issue. In addition, he asserts that the combined anti-sympathy charge[8] given by the judge in combination with this denial was a violation of the Eighth Amendment by limiting his mitigation evidence.

This very issue was rejected in the appellant's first direct appeal. See Keen, 926 S.W.2d at 739 (citing California v. Brown, 479 U.S. 538, 107 S.Ct. 837 (1987)); Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257 (1990); Boyd, 797 S.W.2d at 598. We conclude the trial court properly instructed the jury that it could not consider sympathy. This issue is without merit.

### VII. Batson Challenges

The appellant contends that the State excluded four African-American jurors[9] with its peremptory challenges in violation of Article I, Section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Under the authority of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986), he urges reversal of the sentence. The appellant challenges the dismissal of Jurors McVay, Humphreys, Wilkes, and Houston.

To invoke the protections of *Batson*, the defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender. Batson, 476 U.S. at 94, 106 S.Ct. at 1721; Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1770-71 (1995); State v. Jones, 789 S.W.2d

---

[8] "You should in no case allow mere sympathy or prejudice solely to influence your verdict but should look to the law and all the facts and circumstances proven in the evidence to determine the verdict."

[9] As the State points out, the appellant only challenges the dismissal of three jurors in his motion for a new trial. Although the challenge to the fourth juror has been waived, this Court opts to consider this juror because of the qualitative difference between a death penalty sentence and other sentences. See Bigbee, 885 S.W.2d at 805.

545, 548 (Tenn. 1990). Once the defendant has presented a prima facie case, the trial court shall require the State to give a race-neutral reason for the challenge. Batson, 476 U.S. at 94, 106 S.Ct. at 1721; Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. See also State v. Bell, 759 S.W.2d 651, 653. "The race or gender neutral explanation need not be persuasive, or even plausible . . . . Unless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral." Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. If a race or gender neutral explanation is given, the court must then determine, given all the circumstances, whether the defendant has established purposeful discrimination. Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-24; see also Purkett, 514 U.S. at 767, 115 S.Ct. at 1770-71. Although a trial court must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production, this does not mean that the Court is bound to believe the explanation in making its determination. In other words, while the court may find that a proffered explanation is race-neutral, the court is not required, in the final analysis, to find that the proffered explanation was the actual reason for striking the juror. If the court determines that a race or gender based motive was behind the challenge, the juror may not be excluded. Woodson v. Porter Brown Limestone Co., Inc., 916 S.W.2d 896, 903 (1996).

In making its determination, the trial court must look to the totality of the circumstances for rarely will a party admit that its purpose in striking the juror was discriminatory. Accordingly, the trial court may infer discriminatory intent from circumstantial evidence. "The factfinder's disbelief of the reasons put forth by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination, and . . . no additional proof of discrimination is required." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749 (1993). Additionally, the court may consider whether similarly situated members of another race were seated on the jury or whether the race-neutral explanation proffered by the strikes' proponent is so implausible or fantastic that it renders the explanation pretextual. The trial court may also consider the demeanor of the attorney who exercises the challenge which is often the best evidence of the credibility of his proffered explanations. See Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 1868-69 (1991).

Because a trial record alone cannot provide a legitimate basis from which to substitute an appellate court opinion for a trial court's findings, the trial court must carefully articulate its findings on the record. The trial court has the opportunity to both visually and auditorially observe the demeanor of both prospective jurors and counsel, and accordingly, evaluate their credibility. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994), cert. denied, 516 U.S. 829, 116 S.Ct. 99 (1995) (citing State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992)). On appeal, the trial court's findings are to be accorded great deference and are not to be set aside by this court unless clearly erroneous. See Woodson, 916 S.W.2d at 906 (citing In re A.D.E., 880 S.W.2d 241, 243 (Tex. App. 1994); Smith, 893 S.W.2d at 914.

In the present case, in a hearing outside the presence of the jury, the trial court found that defense counsel had not demonstrated a pattern of discrimination; however, the court had the State place their reasons into the record. With regard to Juror McVay, the State challenged her because

of her initial reservations about the death penalty. Juror Humphreys was challenged because of her relationship with defense counsel and her concern for the care of her child and mother. Juror Wilkes was challenged because he smiled and laughed inappropriately when asked about the factors used in determining whether to impose the death penalty. He also stated that he would "rather be out roofing."

Concerning Juror Houston, the appellant contends that the State's reason for exercising its challenge was simply unfounded.[10] The State contends that Juror Houston was uncertain in her response to impose the death penalty. Moreover, the State felt she was garrulous and would be an irritant in the jury room. The trial court did not "find any basis for any gender or race problems in the *Batson* matter and will overrule your objection." (Italics added). We agree with the trial court that the appellant has failed to establish a prima facie case of purposeful discrimination. In addition, the record reflects the trial court's finding that the proffered reasons for the peremptory strikes were not racially motivated and the trial court's finding was not clearly erroneous. Thus, this issue is without merit.

## VIII. Individual Voir Dire

Due to the trial court's denial of individual voir dire, the appellant contends that his right to an impartial jury and due process were violated as guaranteed by the Sixth and Fourteenth Amendment of the United States Constitution because it impaired his right to use his peremptory challenges. The State contends the trial court acted appropriately.

The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. Cazes, 875 S.W.2d at 262; State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339 (1994). "Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." Harris, 839 S.W.2d at 65 (citing Porterfield, 746 S.W.2d at 447); Howell, 868 S.W.2d at 247. Here, the appellant does not allege the presence of any potentially prejudicial material. There is no support in the record of prejudice regarding group voir dire of the jurors' views of the death penalty. See Harris, 839 S.W.2d at 65; Cazes, 875 S.W.2d at 262. The Tennessee Supreme Court has repeatedly held that death qualification of jurors is not required to be conducted by individual, sequestered voir dire. See State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994) (citing Smith, 857 S.W.2d at 19). The decision of the trial court denying individual voir dire of the venire remains within the sound discretion of the court, and will not be reversed by this Court absent a finding of "manifest error." Howell, 868 S.W.2d at 247-248.

---

[10] We note, at this juncture, that the record reflects two jurors named Houston. The appellant does not specifically indicate which Juror Houston he is challenging. In his brief, it appears that he is challenging the first Juror Houston. However, the State refers to the second Juror Houston when exercising its peremptory challenge. The record reflects that the challenged juror was Rosie Houston.

The appellant filed a pre-trial motion requesting individual voir dire for pre-trial publicity and the juror's views on the death penalty. The motion was renewed before the beginning of the proceedings. The trial court denied the motion; however, the appellant concedes, that if necessary, the court would have allowed questioning at the bench. The appellant has failed to demonstrate any prejudice resulting from the trial court's decision. Therefore, we conclude that the trial court did not abuse its discretion in denying the motion for individual voir dire. This issue is without merit.

In addition, the appellant contends that his equal protection rights under the Fourteenth Amendment to the United States Constitution were violated because individual voir dire is granted routinely in counties other than Shelby County. The State contends this issue was waived pursuant to Tenn. Ct. Crim. App. R 10(b) because the appellant's brief and the record contain no evidence of these allegations. To prevail upon a claim of an equal protection violation, the appellant bears the burden of proving "the existence of purposeful discrimination. . ." and that such discrimination had "a discriminatory effect on him." Irick, 762 S.W.2d at 129 (citing McCleskey, 481 U.S. at 279, 107 S.Ct. at 1766; see also Keen, 926 S.W.2d at 739. Here, the appellant has failed to carry the burden imposed upon him. For the above stated reasons, this issue is meritless.

## IX.  Introduction of Photographs

The appellant contends that the trial court erred by allowing the State to introduce, over objection, two photographs of the victim, one taken before her death and the other a postmortem photograph, because the probative value was substantially outweighed by the unfair prejudice. The first picture was identified by the victim's grandfather which the court introduced solely for identification purposes. Thereafter, Officer Wilson identified the victim in the picture as the same person that was discovered in the Wolf River. The trial court admitted the picture into evidence finding the picture relevant to the identity of the victim and to the nature of the crime.

Through the testimony of Dr. Francisco, the State introduced a postmortem photograph of the victim. The picture corroborated the medical examiner's testimony of the cause of death and method of strangulation. The trial court admitted this picture into evidence based upon its relevance to the heinous, atrocious, or cruel aggravator and the other circumstances of the murder.

The appellant argues that the pictures should have been excluded because identity and the cause of death were uncontested issues. Moreover, he argues that the evidence of the second photograph was inflammatory and cumulative of the medical examiner's testimony.

Tennessee courts have followed a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "The admissibility of photographs lies within the discretion of the trial court." Id. The court's "ruling, in this respect, will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. (citations omitted); see also Stephenson, 878 S.W.2d at 542; State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1995). However, before a photograph may be admitted into evidence, it must be relevant to an issue that the jury must decide and the probative value of the

-35-

photograph must outweigh any prejudicial effect that it may have upon the trier of fact. State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993) (citation omitted); see also Tenn. R. Evid. 401 and 403. The record indicates that the first photograph was offered by the State to establish the victim's identity. We agree with the appellant that the identity of the victim was not at issue at the appellant's resentencing hearing; and, therefore, we find that this photograph was irrelevant[11]. However, we conclude that its admission, although erroneous, was without prejudicial impact upon the jury and constitutes harmless error. See Tenn. R. Crim. P. 52(a).

With regard to the postmortem photograph, our supreme court has held that photographs may be introduced in order to illustrate testimony. Stephenson, 878 S.W.2d at 542. Moreover, the decision to admit or limit cumulative evidence rests within the sound discretion of the trial court. State v. Brown, 836 S.W.2d 530, 553 (Tenn. 1992) (photographs of victim's body admissible despite oral testimony "graphically" describing victim's injuries). See also State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577 (1994) (color photographs of deceased victims at scene of crime were admissible despite introduction of extensive color videotape showing victims' bodies as they were found). In any event, a relevant photograph is not rendered inadmissible merely because it is cumulative. Bigbee, 885 S.W.2d at 807; Van Tran, 864 S.W.2d at 477. See Smith, 893 S.W.2d at 924 (photographs of victim appropriately admitted for establishing "heinous, atrocious, cruel" aggravating factor).

All photographs of dead bodies, especially those involving death by a criminal agency, are disturbing to the average person. After viewing the postmortem photograph, we find nothing particularly gruesome in its nature beyond that which is accurately depicted. Here, the photograph was relevant to supplement and clarify the testimony of the medical examiner and the officer in establishing the cause of death, see Stephenson, 878 S.W.2d at 542, and to the show the brutality of the attack and extent of force used against the victim, from which the jury could infer the "heinous, atrocious, or cruel" aggravator. See Brown, 836 S.W.2d at 551; see e.g., Payne, 791 S.W.2d at 19-20; State v. Miller, 771 S.W.2d 401, 403-404 (Tenn. 1989); Porterfield, 746 S.W.2d at 449-450; State v. McNish, 727 S.W.2d 490, 494-495 (Tenn. 1987). We conclude that the probative value of this photograph far outweighed its prejudicial impact. Therefore, this issue is without merit.

## X. Victim's Impact Reference During Closing Argument

The appellant argues that the prosecutor used improper victim impact references during his closing argument to the jury. The State contends that since appellant's counsel offered testimony for the impact upon the appellant's family asking the jury to spare his life, the prosecutor's comment

---

[11] This court has previously held that a photograph of the deceased during her lifetime is admissible at the guilt phase of the trial to establish the corpus delicti in a homicide case when the question involves the subordinate issue of the identity of the deceased named in the indictment. See State v. Nesbit, No. 02S01-9705-CR-00043 (Tenn. Sept. 28, 1998) (for publication), appendix at p. 10.

on the evidence was not inappropriate because it merely showed that the victim's family had also suffered.

The trial court excluded victim impact evidence as irrelevant in the case-in-chief and rebuttal, but allowed the State to argue inferences of proof in their closing argument. The contested portion of the argument is:

> The defendant's family asks you to spare the defendant's life. Don't you think that Nicki Reed's family would have given anything they had to be out on that boat dock begging this defendant not to kill Nicki? Don't you think they would give anything they had not to have to go to bed at night knowing that their little eight-year old baby died at the bottom of the Wolf River, naked, violated, cold and alone? Don't you think, ladies and gentlemen, they would give anything they had to be able to say – to tuck little Nicki in bed at night and say, honey, that monster wasn't real.

Specifically, the appellant contends this argument was improper because only evidence relating to the aggravating or mitigating circumstances is relevant in a sentencing hearing, and therefore "argument about irrelevant matters is improper" citing Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). Additionally, he states that this "inflammatory argument" caused the jury to impose the death penalty in an "arbitrary and capricious manner" thereby diminishing his rights under the Eighth Amendment with an emotional appeal.

There exists no *per se* bar under the Eighth Amendment to the admissibility of victim's impact evidence. Nesbit, No. 02S01-9705-CR-00043; Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597 (1991); Bigbee, 885 S.W.2d at 811-812. Thus, the appellant's constitutional challenge is excluded. As to the appellant's challenge under our sentencing scheme, our supreme court recently observed, "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime*." Nesbit, No. 02S01-9705-CR-00043; see Tenn. Code Ann. § 39-13-204(c). This holding in *Nesbit* permits only that victim impact evidence which is not so prejudicial "that it renders the trial fundamentally unfair," Nesbit, No. 02S01-9705-CR-00043 (citing Payne, 501 U.S. at 825, 111 S.Ct. at 2608) or that which should be excluded under Tenn. R. Evid. 403. As well, prosecutorial argument of victim impact evidence must be exercised with restraint. Nesbit, No. 02S01-9705-CR-00043 ("inflammatory rhetoric that divert the jury's attention from its proper role or invites an irrational, purely emotional response to the evidence is not permissible and should not be tolerated by the court.").

In order to determine whether the prosecutor's comment requires reversal, we must determine whether the argument "affected the verdict to the prejudice of the defendant." Bigbee, 885 S.W.2d at 809 (quoting Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). Our supreme court has outlined the following factors for us to consider:

(1) the conduct complained of viewed in light of the facts and circumstances of the case:

(2) the curative measures undertaken by the court and the prosecution;

(3) the intent of the prosecutor in making the improper arguments;

(4) the cumulative effect of the improper conduct and any other errors in the record; and

(5) the relative strength and weakness of the case.

Nesbit, No. 02S01-9705-CR-00043.

We conclude that the State did not over emphasize the victim impact evidence in its closing argument. Nothing in the record indicates that the prosecutor acted in bad faith. Even though the trial court allowed the prosecutor to argue victim's impact inferences from the evidence, the trial court instructed the jury,

> the court has read to you the aggravating circumstances which the law requires you to consider if you find that they have been established by the evidence beyond a reasonable doubt. You shall not take account of any other aggravating facts or circumstances as the basis for deciding whether the death penalty would be appropriate punishment in this case.

The jury was instructed not to consider victim impact evidence to determine whether or not to impose the death penalty. It is well settled in the state of Tennessee that a jury is presumed to have followed a trial court's instructions. State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985); State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1985). In light of the strong evidence against the appellant in support of the aggravating factors, we believe the prosecutor's comment in no manner affected the verdict rendered by the jury. Therefore, this issue is without merit.

## XI. Constitutionality of the Death Penalty

The appellant concedes that the constitutionality of the death penalty has been upheld by the Tennessee Supreme Court, however, he raises the following issues in order to preserve them for later review. The appellant contends that (1) the death penalty statute fails to meaningfully narrow the class of eligible defendants[12]; (2) the prosecution has unlimited discretion in seeking the death

---

[12] Within this issue the appellant challenges Tenn. Code Ann. § 39-13-204(i)(4), (i)(5), (i)(6), and (i)(7). In this case, the State only relied upon Tenn. Code Ann. § 39-13-204(i)(2) and (i)(5). Therefore, the appellant is without standing to challenge (i)(4), (i)(6), and (i)(7). The constitutionality of (i)(5) is addressed previously in this opinion.

penalty; (3) the death penalty is imposed in a discriminatory manner based upon economics, race, geography, and sex; (4) there are no uniform standards for jury selection; (5) juries tend to be prone to returning guilty verdicts; (6) the defendant is denied the opportunity to address the jury's popular misconceptions about parole eligibility, cost of incarceration, deterrence, and method of execution; (7) the jury is instructed it must unanimously agree to a life sentence, and is prevented from being told the effect of a non-unanimous verdict; (8) courts fail to instruct the juries on the meaning and function of mitigating circumstances; (9) the jury is deprived of making the final decision about the death penalty; (10) the defendant is denied the final argument during the sentencing phase; (11) electrocution is cruel and unusual punishment; and (12) the appellate review process in death penalty cases is constitutionally inadequate.

These issues have repeatedly been rejected by our supreme court. See Smith, 893 S.W.2d at 908; Brimmer, 876 S.W.2d at 75; Cazes, 875 S.W.2d at 253; Smith, 857 S.W.2d at 1; Black, 815 S.W.2d at 166; Boyd, 797 S.W.2d 589; State v. Teel, 793 S.W.2d 236 (Tenn. 1990); Thompson, 768 S.W.2d at 239. See also Keen, 926 S.W.2d at 741-44.

## XII.  Proportionality Review [DELETED]

## CONCLUSION

After an extensive review of the record and the issues before us, as mandated by Tenn. Code Ann. § 39-13-206(b), and (c), and for the reasons stated herein, we affirm the appellant's sentence of death.  We conclude that the sentence of death was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstances, and the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. Moreover, a comparative proportionality review, considering both the "nature of the crime and the defendant," Tenn. Code Ann. § 39-13-206(c)(1)(D), convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.[16]

/s/  DAVID G. HAYES, Judge

CONCUR:

/s/  JOE G. RILEY, Judge

/s/  JOHN EVERETT WILLIAMS, Judge

---

[16]  No execution date is set.  Tenn. Code Ann. § 39-13-206(a)(1) provides for automatic review by the Tennessee Supreme Court upon affirmance of the death penalty.  If the death sentence is upheld by the higher court on review, the supreme court will set the execution date.