# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 17, 2010 Session

## STATE OF TENNESSEE v. LEONARD ALLEN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-A-42     Seth Norman, Judge**

---

### No. M2007-02581-CCA-R3-CD - Filed April 5, 2011

---

A Davidson County Criminal Court jury convicted the appellant, Leonard Allen, of especially aggravated robbery, and the trial court sentenced him to twenty years in confinement to be served at one hundred percent. On appeal, the appellant contends that (1) a plea agreement he entered into with the State after the jury convicted him is invalid because he had already filed a notice of appeal to this court; (2) the trial court committed plain error by not ruling that a photograph array shown to the victim months after the robbery and introduced into evidence at trial was impermissibly suggestive; and (3) the evidence is insufficient to support the conviction. Based upon the record and the parties' briefs, we affirm the appellant's conviction for especially aggravated robbery.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Michael Meise (on appeal), Dickson, Tennessee, and Paul Walwyn and Jay Martin (at trial), Nashville, Tennessee, for the appellant, Leonard Allen.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

Bernadette Woodbury testified that on the evening of December 9, 2001, she was working as the manager of the Dollar General store on Antioch Pike in Nashville. About 5:30 p.m., Woodbury took the money drawer out of one of the cash registers and carried it to her office in order to put the money in the store safe. As she stepped into the office and turned to close the door, she saw a man standing there and pointing a handgun at her. The man pushed Woodbury, and she fell over the office desk and onto the floor. She said the man hit her on the head with the gun and stated, "[B]itch, I'm going to kill you. It ain't your money anyway." The man hit Woodbury on the head again. Woodbury said she rolled over, saw "stars," and lost consciousness. When she woke up, the man and the money were gone.

Woodbury testified that the man took seven hundred twenty dollars and that she did not remember seeing him prior to December 9, 2001. However, just before the robbery, she had seen him sitting on a table in the store and talking on a cellular telephone. She said she approached him, asked if she could help him find anything, and heard him say into the telephone, "I'm just your average black man." The man then shook his head at her, and Woodbury walked away. After the robbery, Woodbury went to a hospital. She had a cut on her head and injuries to her right hand and thumb. At the time of trial, Woodbury had had two surgeries on her hand and was expecting a third because she could not extend one of her fingers. She described the robber to police as African American; in his late thirties; six foot, one inch tall; and weighing about one hundred forty pounds. She told them he was wearing a camouflage outfit that consisted of camouflage pants and a camouflage jacket or shirt that was not tucked into his pants. She said the robber also was wearing "black Army men, heavy glasses" and a black knit cap. The police showed Woodbury a photograph array while she was in the hospital, but she did not identify anyone as the robber. The State showed Woodbury some camouflage clothing and a pair of broken black-rimmed glasses, and she said they looked exactly like the items worn by the robber.

Woodbury testified that on May 6, 2002, she was at work and heard a voice. She said, "Somebody beating you over the head and yelling at you. You remember that voice." Woodbury said that she turned around, that she saw the appellant paying for something at the cash register, and that "it was him." The appellant and Woodbury made eye contact, and Woodbury was scared. She said that "he smirked at me and [was] like, yeah, you know me." The appellant finished his transaction with the cashier and left the store. Woodbury told the cashier, "[T]hat's the man that beat me." A customer offered to follow the appellant, but Woodbury was afraid the appellant had a gun. She and a customer walked outside, and she wrote down the license tag number for the appellant's gold Pontiac Grand Am. Woodbury went back inside the store, called her regional manager, and reported that she had seen the man who robbed her on December 9. On May 15, 2002, police officers showed Woodbury a new array of six photographs, and she picked out the appellant's photograph. Woodbury acknowledged that according to comments written on the array, she looked at the

photographs, pointed to the appellant's picture, and said, "[T]hat's him. He was a little thinner." When asked by the State if she had any doubt about the robber's identity, Woodbury said, "No, he's the guy that beat me up and robbed the store. He's the guy."

On cross-examination, Woodbury testified that the store did not have video cameras. When she fell onto the floor during the robbery, the appellant kneeled over her and hit her. She said she "could see his face clear as all get out, I could see the outfit." She also said the camouflage clothing and glasses showed to her at trial "look[ed] just like what he had on."

Detective Jeff Baugh of the Metropolitan Nashville Police Department testified that on May 22, 2002, he and other officers went to the appellant's apartment to execute a search warrant. They knocked on the door and forced the door open. The appellant came out of a bedroom and said he had been asleep. Officers began searching the apartment for a camouflage jacket, camouflage pants, and a pair of black-framed glasses. The officers found the items and collected them as evidence. The State showed the detective the same camouflage jacket, camouflage pants, and pair of black-framed glasses that it had showed to Bernadette Woodbury during her testimony. Detective Baugh identified them as the items collected from the appellant's apartment.

The appellant testified that at the time of trial, he was forty-eight years old. In December 2001, he was working for Cumberland Swan, a factory, and had been working there for four years. He said he was paid over fourteen dollars per hour and had never missed one day of work. The appellant would go to the Dollar General store once or twice per month to buy cleaning supplies and had seen Bernadette Woodbury in the store about three times. Woodbury sometimes asked the appellant if he needed help and was always friendly to him. The appellant said he owned camouflage clothing but had never worn it into the store. He said that he had never owned a handgun or a cellular telephone and that he had never loitered in the store because it would have been inappropriate.

The appellant testified that he went into the store one day in May 2002. He saw Woodbury and said hello to her. Woodbury replied, "[H]ey, I know you," and they chatted. The appellant said that their interaction was "a pleasant eye to eye contact type thing," that he thought "some type of flirtation was going on," and that Woodbury did not look at him strangely. Several days later, the police arrested him while he was at the laundry mat across the street from the store. He said he had served in the United States Marines and owned a pair of thin black-framed glasses. After the police arrested the appellant, he paid his bond and was released from custody. A few days later, police officers broke down his apartment door while he was asleep. He said the clothing and glasses that the officers found in his apartment were not hidden and that he had "nothing to hide." He said that he never robbed the Dollar General store or harmed Woodbury and that "[w]hy should I when [I] have a bank

account raging on fifteen thousand [dollars]." At first, the appellant claimed he had no criminal history. However, he later acknowledged on direct examination that he was arrested about fifteen years prior to trial for possession of drugs and drug paraphernalia.

On cross-examination, the State questioned the appellant extensively about his criminal record. The appellant stated that he was arrested one time as a teenager. He said he did not remember pleading guilty in August 1991 to possession of a controlled substance in New York. However, he acknowledged being convicted of a drug charge in September 1992 and receiving a fifteen-day sentence. He also acknowledged that in 1993, he was convicted in New York of fraudulently obtaining transportation without paying after he jumped over some turnstyles. He was convicted of the same offense in 1994 and received a sentenced to be served on community service. He acknowledged that in 1996, he was charged with assault with intent to commit physical injury after an altercation with his then-girlfriend. The appellant also acknowledged that he was arrested in 1996 on a drug charge and that he pled guilty in 1998 in New York to possession of drug paraphernalia and received a six-month probation sentence.

The jury convicted the appellant of especially aggravated robbery, a Class A felony. After a sentencing hearing, the appellant received a twenty-year sentence to be served at one hundred percent.

## II. Analysis

### A. Plea Agreement

Because this court must ensure that an appeal is properly before us, we believe it is necessary to address an unusual situation in this case. Both the appellant and the State contend that a plea agreement entered into by the appellant and the State after the jury convicted him is invalid because he had already filed a notice of appeal to this court. We agree. Therefore, the appellant's original jury conviction remains in effect, and the appellant has properly appealed that conviction to this court.

The jury convicted the appellant of especially aggravated robbery on June 28, 2005. On March 15, 2006, the trial court sentenced him as a violent offender to twenty years with one hundred percent of the sentence to be served in confinement. The trial court entered the judgment of conviction that same day. On June 20, 2006, the appellant filed a pro se document titled "PETITION FOR POST-CONVICTION RELIEF AND/OR NEW TRIAL," claiming that he received the ineffective assistance of trial counsel. On August 7, 2006, the petitioner, through newly appointed counsel, filed a motion requesting permission to late-file a motion for new trial. On September 15, 2006, the trial court granted the motion. The

appellant filed a motion for new trial on September 21, 2006, arguing that the trial court erred by failing to grant his motion for judgment of acquittal after the close of the State's proof because the evidence was insufficient to support the conviction. In a subsequently filed amended motion for new trial, the appellant also claimed that he received the ineffective assistance of trial counsel. A hearing on the motion occurred on August 17, 2007. Although a transcript of the hearing is not in the appellate record, the trial court's October 24, 2007 written order denying the motion reveals that the appellant argued during the hearing that the State failed to prove the robber's identity. However, the trial court ruled that the appellant's identity was sufficiently established by the victim. The trial court refused to address the appellant's ineffective assistance of counsel claims in order for the appellant to preserve those claims for a later time. The appellant filed a notice of appeal to this court on November 7, 2007.

On January 22, 2008, the appellant and the State entered into a plea agreement in which the appellant agreed to plead guilty to aggravated robbery, a Class B felony, in return for a ten-year sentence with credit for time already served and the remainder of the sentence to be served on probation. A guilty plea hearing was held that same day. During the hearing, the State informed the trial court as follows:

> Judge, as the Court will recall, there was a trial by jury, a conviction of a greater offense. There was a motion for new trial late filed which included post-conviction issues. . . . We constructed this agreement in lieu of that, it would be basically setting aside the previous conviction, I suppose. Under this agreement we are not admitting any ineffective [assistance] claims; however, in the interest of justice, we would set aside that conviction and enter this plea subject to his agreement to this.

The trial court accepted the appellant's guilty plea and entered a new judgment of conviction for aggravated robbery on January 22, 2008.

The appellant and the State concede that the appellant's guilty plea is invalid. "In a criminal case, when a notice of appeal is filed, the jurisdiction of the Court of Criminal Appeals attaches, and the trial court loses jurisdiction. . . . Any judgments made outside the court's jurisdiction are void." State v. Green, 106 S.W.3d 646-59 (Tenn. 2003) (citations omitted). Once the appellant filed his notice of appeal on November 7, 2007, the trial court lost jurisdiction in the case and could not enter a new judgment of conviction on January 22, 2008. Therefore, the appellant's jury conviction for especially aggravated robbery and

twenty-year sentence remain in effect, and he has properly appealed that conviction to this court.

## B. Plain Error of Photograph Array

The appellant contends that the trial court committed plain error by not ruling sua sponte that a photograph array shown to the victim six months after the robbery and introduced into evidence at trial was impermissibly suggestive. The State contends that plain error review is not necessary. We conclude that the photograph array was unduly suggestive but that the appellant is not entitled to plain error relief.

According to the evidence at trial, Bernadette Woodbury told police shortly after the December 9, 2001 robbery that the robber had been wearing a camouflage outfit that consisted of camouflage pants and a camouflage jacket or shirt that was not tucked into his pants. The police showed a photograph array to Woodbury while she was in the hospital, but she did not identify anyone. On May 6, 2002, Woodbury saw the appellant in the store and immediately recognized him as the robber. On May 15, 2002, police officers brought a new array with six different photographs to the Dollar General and showed it to Woodbury. She recognized the appellant's photograph and identified him as the man who robbed and beat her. At trial, the State showed a photograph array to Woodbury, and she identified it as the same array the police showed her on May 15.

Apparently, the array Woodbury identified at trial and introduced into evidence was a photocopy of the array she saw on May 15 because the State informed the trial court, "And Judge, we have copies of it and I apologize for the copy. It's not as good." The array introduced into evidence consists of six black and white photographs of African-American men. Although mainly their faces are visible, their upper chest and clothing are also visible. In the appellant's photograph, he is wearing a camouflage shirt or jacket that is open in the front. Under the shirt or jacket, he is wearing a black shirt over a white t-shirt. The appellant is the only suspect wearing camouflage. Although the defense cross-examined Woodbury about her identification of the appellant, the defense did not object to the array before or during the trial.

The appellant contends that the array was impermissibly suggestive because he was the only suspect wearing camouflage clothing. Therefore, the appellant argues, the trial court should have sua sponte determined whether the array met the "Biggers test." The State argues that this court should not address the issue as plain error because all five factors required for plain error have not been established.

-6-

In Neil v. Biggers, 409 U.S. 188, 198-99 (1972), the United States Supreme Court established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. Biggers, 409 U.S. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)). If the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Biggers, 409 U.S. at 198-99.

After examining the photograph array which was entered into evidence, we agree with the appellant that because he was the only individual wearing a camouflage shirt, the photographic lineup was suggestive. Moreover, if the original array shown to Woodbury consisted of color, as opposed to black and white, photographs, the camouflage clothing would have been even more distinguishable, making the original array more suggestive than the one introduced at trial. However, a pretrial identification procedure, even if suggestive, will not negate the identification of the appellant when it is otherwise reliable. Biggers, 409 U.S. at 198-99; Cribbs, 967 S.W.2d at 794. In Biggers, 409 U.S. at 199-200, the Supreme Court identified five factors for assessing the reliability of an identification: (1) the opportunity of the witness to view the perpetrator at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the perpetrator; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the identification. See also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994). If, using the Biggers standard, a pretrial confrontation was so impermissibly suggestive that it violated an accused's right to due process, both the out-of-court and in-court identifications are excluded. State v. Shanklin, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

After considering these factors, we conclude that the identification procedure in the instant case was unreliable. The testimony did not establish how long Woodbury was able to view the robber. Woodbury saw and spoke with the robber briefly before he attacked her in the office. However, her testimony showed that the robbery itself proceeded quickly, with the robber knocking Woodbury to the floor, hitting her repeatedly, and fleeing with the money. Although Woodbury stated that she saw the appellant's face and clothing clearly while he was hitting her, she also stated that she saw "stars" and lost consciousness, indicating that her vision and level of attention were compromised during the attack. Woodbury described the robber to police as an African-American male; in his late thirties; six foot, one inch tall; and weighing about one hundred forty pounds. The appellant's ethnicity matches that description. However, the appellant would have been forty-five years

old at the time of the offense, and no evidence was presented as to his height or weight. Woodbury was certain of her identification of the appellant when she saw and heard him on May 6. She remained certain of her identification at trial. However, when she identified his photograph from the array on May 15, she noted that he was "a little thinner." Generally, the fact that Woodbury did not identify the appellant until more than five months after the robbery would weigh against the admissibility of the identification. See Biggers, 409 U.S. at 201. However, that factor does not negate Woodbury's reliability in the instant case because she had not previously identified another suspect despite being asked to view another lineup. Id. Nevertheless, based upon the totality of the circumstances, we conclude that the identification in this case was unreliable.

Next, we must determine whether the inadmissible identification rises to the level of plain error. Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the ""plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

The record established what occurred in the trial court, the Biggers test was breached, an unduly suggestive photograph of the appellant was included in the photograph array, and the appellant did not waive objecting to the improper array for tactical reasons. However, we do not believe that consideration of the error is necessary to do substantial justice. Woodbury not only recognized the appellant's face, she also recognized his voice. When she heard him speak on May 6, she immediately recognized his voice as that of the robber. At that point, she turned around and saw the appellant. A search of the appellant's apartment revealed camouflage clothing that looked exactly like clothing the robber had been wearing and the same black-framed glasses. Although the appellant claimed he did not rob the store,

he also claimed he did not have a criminal record, testimony that likely hurt his credibility when the State revealed through its cross-examination that the appellant had multiple prior convictions and arrests. Therefore, we conclude that even though Woodbury's testimony about her identification of the appellant from the photograph array was inadmissible, plain error relief is not warranted in this case.

## C. Sufficiency of the Evidence

The appellant contends that without Woodbury's testimony about identifying him from the photograph array, the evidence is insufficient to support the conviction because the only evidence linking him to the crime is the clothing and glasses police found in his apartment. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319; Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is accomplished with a deadly weapon and results in the victim suffering serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -403(a). "Serious bodily injury" is defined as "bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34).

Taken in the light most favorable to the State, the evidence reveals that on December 9, 2001, Woodbury saw a man sitting on a table in the store and talking on a cellular telephone. She asked if he needed any help, and he said no. Woodbury took the cash drawer from a cash register and walked to her office to put the money in the safe. As she turned to close the door, the man was standing there. He spoke to Woodbury again, knocked her over the desk, and hit her repeatedly with the gun, rendering her unconscious and damaging her hand to the extent it needed repeated surgeries. The man fled with seven hundred twenty dollars. About five months later, Woodbury was working in the store when she heard and immediately recognized the robber's voice. She turned and saw the appellant. Woodbury had described the robber to the police shortly after the crime, stating that he was wearing camouflage pants, a camouflage shirt, and military-style black-framed glasses. When officers searched the appellant's apartment, they found those items. Woodbury testified at trial that the items found in the appellant's apartment looked exactly like the items the robber was wearing on December 9. Woodbury's testimony that she recognized the appellant's voice as that of the robber is direct evidence of his guilt. See State v. Keen, 31 S.W.3d 196, 218 (Tenn. 2000) (defining "direct evidence" as "evidence which proves the existence of the fact in issue without inference or presumption"). Combined with the circumstantial evidence in the case, we conclude that the evidence is sufficient to support the conviction.

We note that in a related argument, the appellant contends that he received the ineffective assistance of counsel for various reasons, including that his trial attorney failed to insist that the trial court rule on his motion for judgment of acquittal after the State's case-in-chief. However, as this court has said,

> [T]he practice of raising ineffective assistance of counsel claims on direct appeal is "fraught with peril" since it "is virtually impossible to demonstrate prejudice as required" without an evidentiary hearing. Instead, "ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief."

State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (citations omitted). In his reply brief, the appellant concedes that this court should not address his ineffective assistance of counsel claims. Given that the trial court refused to make findings of fact or rule on the appellant's ineffective assistance of counsel issues, we agree that it would be inappropriate for us to consider the issues. This ruling does not prevent the appellant from raising the issues again in an appropriate post-conviction proceeding.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the appellant's conviction for especially aggravated robbery.

_____

NORMA McGEE OGLE, JUDGE