IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 6, 2017

FILED

09/08/2017

Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. MARCUS JERMAINE BROOKS**

**Appeal from the Circuit Court for Madison County**
**No. 16-93     Roy B. Morgan, Jr., Judge**

_____

**No. W2016-02071-CCA-R3-CD**

_____

A Madison County Circuit Court Jury convicted the Appellant, Marcus Jermaine Brooks, of aggravated assault by strangulation, a Class C felony, and the trial court sentenced him as a Range II, multiple offender to eight years in confinement.  On appeal, the Appellant contends that the evidence is insufficient to support the conviction.  Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

George D. Norton, Jr., Selmer, Tennessee, for the appellant, Marcus Jermaine Brooks.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Ann Thompson, Senior Counsel; James G. Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In February 2016, the Madison County Grand Jury indicted the Appellant for aggravated assault by strangulation and misdemeanor assault of his then-girlfriend, Nicole Hewitt Anderson.  On the morning of trial, the trial court announced that the State was dismissing the misdemeanor assault charge via nolle prosequi.

At trial, the victim testified that she was a history professor at Lane College and that she and the Appellant, a student at the college, were in a relationship for two and one-half years.  On September 30, 2015, the victim, who was also a certified lifeguard,

had been hired to work as a lifeguard at a student pool party. The Appellant was going to the party, so the victim and the Appellant went to the party together in the victim's car. The Appellant asked her for a ride home from the party, and the victim agreed.

The victim testified that after the party, a male student approached her to talk about missing class. The Appellant asked the student why he was talking to the victim "after hours" and ordered the victim into her car. The Appellant and the student "exchanged words," and the victim, who was sitting in the passenger seat of her car, tried to get out to calm the Appellant. However, the Appellant pushed on the door so that she could not get out. The Appellant got into the driver's seat and asked the victim about the student and if she was having a sexual relationship with him.

The victim testified that the Appellant drove to his house on Davidfield Cove, that they argued during the drive, and that she told him she did not want to be in a relationship with him anymore. When they arrived at the Appellant's home, they were still arguing. The victim got out of her car and sat in the driver's seat so she could leave, but the Appellant blocked the driver's door so she could not close it. He then grabbed her hair, pulled her out of her car, and pulled her onto the ground in his front yard. The victim said that the Appellant put his knees on her chest, that he began strangling and hitting her, and that she was screaming. She stated,

> He's hitting me in the face. I can remember him hitting me in
> the face. I was trying to block the punches. But the main
> thing that he was -- he was strangling me and I was trying to
> tell him to stop and I was trying to scream in between.

The Appellant had both of his hands around the victim's neck in a "tight choke hold." The victim could not breathe and was becoming very weak. She stated that "he would stop every now and then and say some words to [her]" and that he told her, "'I don't have any problems with going to jail for you.'" He also told her, "'My face is the last thing that you'll ever see[.]'" At that point, the victim thought the Appellant was going to kill her. She felt her eyes roll back into her head and passed out.

The victim testified that when she came to, the Appellant was dragging her by her hair into her car. He then dragged her out of her car and began choking her with both hands. The Appellant's fingers were on the back of her neck, and his thumbs were on her throat. The victim said she tried to scream but could not scream loudly. The Appellant's mother came out of the house and tried to make the Appellant stop. She could not stop him and went back inside.

The victim testified that the Appellant dragged her into her car a second time and told her to get out of his yard. She was disoriented and could not see because it was dark outside and her glasses had been knocked off her face. However, she managed to drive to

the parking lot of a nearby Toys R Us. A friend telephoned the victim, and she told him to call the police. The victim said she thought she passed out again because when she woke, her friend was at her car. Paramedics arrived and took the victim to the emergency room. The victim was in the hospital from 10:30 p.m. to 6:00 a.m. The State showed her photographs taken in the Toys R Us parking lot and at the hospital, and she said the photographs showed her with hair torn from her scalp, redness and injuries to her eye and lip, red marks around her neck, bloodshot eyes, blood coming out of her ear, and bruises on her arms and legs. She said that she had a "CAT" scan and three x-rays, that medical personnel examined her trachea because she could barely talk, and that she received "[s]omething topical" for her lip, eye, and bruises. The victim said she did not have contact with the Appellant after the incident.

On cross-examination, the victim testified that she had been a professor of history for thirteen years at the time of trial. The victim's first encounter with the Appellant occurred when he was twelve years old, and she saved his life while working as a lifeguard at the Lane College NYSP program. The Appellant later enrolled at Lane and was the victim's student. They were in a romantic relationship while he was her student, but the victim did not think their relationship was a problem because the Appellant was in a graduate program for non-traditional, adult students. The victim acknowledged that she taught in the graduate program.

The victim testified that no drugs or alcohol were at the pool party. She acknowledged that the Appellant did not force her into her car after the party, that she allowed him to drive her car, and that she was not afraid of him. The victim gave two statements to the police after the incident and said in her second statement, but not her first, that the Appellant kicked her. She acknowledged telling police that she pretended to be dead so he would stop harming her. She also acknowledged that she was gasping for air during the incident. Defense counsel asked, "Yet you yelled for help[?]" The victim explained, "I was trying to scream while he was choking me. He would stop; there were intervals where he would stop. He still had his hands around my neck. He would stop the pressure, and then he would continually apply pressure during intervals of this attack."

The victim testified that the Appellant had been abusive to her one time previously and that she did not notify the police about the incident. The victim acknowledged that she attended The Shriners Ball in November 2015 and that the Appellant was the chairperson of the event. She knew he was at the ball, and she did not leave. She maintained, though, that she did not have contact with him by attending the ball. The victim denied sitting outside the Appellant's house or his girlfriend's house after the incident on September 30.

Officer Brandon Bankston of the Jackson Police Department (JPD) testified that at 10:35 p.m. on September 30, 2015, he responded to a report of an aggravated domestic

assault. He went to the Toys R Us parking lot and made contact with the victim in a Toyota. The victim told Officer Bankston that she "dropped her ex-boyfriend off" at a home on Davidfield Cove and that an altercation ensued. Officer Bankston said that the victim was "[o]ut of breath, unable to talk clear" and that she appeared "[d]istraught." He called for medical assistance and took photographs of her while she was sitting in an ambulance. Officer Bankston issued a "BOLO," also known as a "be on the lookout," for the Appellant.

On cross-examination, Officer Bankston testified that the victim's Toyota was parked in a parking space correctly and that she was sitting in the vehicle with the doors closed. He did not remember if she was wearing a necklace. The victim never passed out in Officer Bankston's presence, and he never spoke with the Appellant. He stated that the Appellant's home on Davidfield Cove was less than a five-minute drive from the Toys R Us. On redirect examination, Officer Bankston acknowledged that the Toys R Us was the first large, well-lit area a driver would come to from Davidfield Cove.

Officer Timothy Darren Moore of the JPD testified that he was dispatched to Jackson General Hospital about 4:00 a.m. on October 1, 2015. Medical personnel had found additional injuries to the victim at the hospital, so Officer Moore photographed those injuries.

Brandi Johnson testified that she was a contract investigator for the Domestic Violence Unit of the JPD and that she interviewed the victim. From the victim's interview and photographs, Johnson had enough evidence to prepare a warrant for the Appellant's arrest. The Appellant was arrested, and Johnson interviewed him on October 10, 2015. The Appellant signed a written waiver of his rights form and gave a statement at 5:59 a.m. In the statement, the Appellant admitted to assaulting the victim. He said that he did not remember punching her but that he "did pull her by her hair and choke her." He also said he "put both hands around her neck." The Appellant claimed that he was "angry and stressed" at the time of the incident and that "[i]t got out of hand." He stated that he was not trying to kill the victim and that he was sorry the incident happened. Johnson said that she wrote out the statement for the Appellant and that he signed it at 6:08 a.m. On cross-examination, Johnson testified that she read the arrest warrant to the Appellant before he gave his statement and that she took his statement in a jail cell.

Chloe Mercer testified for the Appellant that she was his "friend[]." She said that she did not know the victim personally but that she knew the victim "from her calling me on the telephone and following me and parking down the street from my house." Prior to September 30, 2015, Mercer saw the victim outside Mercer's house more than five times. On one occasion, Mercer was sitting on her front porch when the victim drove by and honked her horn. On two of the occasions, the Appellant was with Mercer. Mercer stated that one time, the victim parked two driveways down from Mercer's driveway and

watched Mercer and the Appellant go into Mercer's home. The second time, the victim drove by as Mercer and the Appellant were about to turn into Mercer's driveway. Mercer said that on the night of The Shriners Ball, the victim had a date but "kept walking by our table to catch I guess [the Appellant] sitting at the table, but he was never there." While the Appellant was presenting an award, the victim attempted to go on the stage and "kinda put on a scene." On cross-examination, the State asked that Mercer clarify her relationship with the Appellant, and she stated that she was his girlfriend.

The Appellant testified that he was forty years old and that he first met the victim at Lane College in a program for preteens and teenagers. Later, the victim was the Appellant's professor for a world geography class. They were also in a romantic relationship during that time and "joked" about getting married but were never formally engaged. The Appellant said there were problems with the relationship in that the victim accused him of "cheating" on her with Chloe Mercer. Defense counsel asked the Appellant if he was indeed cheating on the victim, and the Appellant said he could not remember. The Appellant said the victim followed him, "went through" his cellular telephone, and contacted Mercer. The victim also sat in front of his house. "At some point," the Appellant began cheating on the victim, so they went to counseling one time.

The Appellant testified that on September 30, 2015, another student invited him to a pool party. He denied causing "a scene" at the party and said he "simply asked" the victim about her relationship with a male student who was at the party. The Appellant said that he was standing in the middle of the parking lot with the student and that he never pushed on the victim's car door or blocked the door so that she could not get out of her car. The student turned to go to his dorm room, so the Appellant got into the victim's Toyota to drive home. The victim never told him that she did not want him to drive her car or expressed any concerns about his demeanor.

The Appellant testified that the drive to his home lasted ten to fifteen minutes. During the drive, the Appellant and the victim talked about how their relationship was not working. He said they were "angered" by the conversation because they were "truly trying" to make their relationship work. There was "verbal contact" between them but nothing physical. When they arrived at the Appellant's home, the victim got out of her car and came around to the driver's side. The Appellant said that he and the victim were still arguing, that he attempted to go into his house, and that he "nicely" asked the victim to leave.

The Appellant acknowledged that their argument became physical and said that he "was hit," had a swollen lip, and had a torn shirt. Defense counsel asked who hit first, and the Appellant answered that he could not remember because "everything was happening so fast and it was going on continuously back and forth." He denied strangling the victim and said that she did not pass out, that her eyes did not roll back into her head, and that she did not play dead. After their altercation, the victim got into her

car. The Appellant did not force her into her car or prevent her from getting into it, and he did not prevent her from driving away. The victim was angry when she left and drove away at a high rate of speed, but the Appellant did not notice anything else unusual about her driving. He said there had never been physical violence between them before this incident.

The Appellant testified that in October 2015, he was arrested for assaulting the victim and spent the night in jail. Early the next morning, a woman questioned him, and he wrote out his statement with a red pen. Defense counsel showed him the statement written by Brandi Johnson, and he said it did not encompass everything he said during his interview. He said he did not choke the victim but acknowledged telling Johnson that he did not intend to kill her. The Appellant said that he had "just awakened" for the interview, which occurred at "5 something"; that he "wasn't fully functioning"; and that he could not have explained the incident to Johnson in just nine minutes.

The Appellant testified that the victim made contact with him after September 30. She attended The Shriners Ball, tried to get close to him at the ball, and stayed for the entire event. She also made contact with him at the mall. He said that he was very sorry the September 30 incident happened and that it had affected his life "greatly." The Appellant used to be employed at Lane College but no longer worked there, and his relationship with his children had been impacted. He said he could not dispute that a physical altercation occurred between him and the victim but that he did not strangle her.

On cross-examination, the Appellant denied grabbing the victim's hair or pulling her out of her car. He acknowledged that Johnson showed him his arrest warrant prior to his interview and that she read the warrant's narrative of the September 30 incident to him. She asked the Appellant what happened, and he told her about the altercation. The Appellant acknowledged signing the statement that Johnson wrote for him but said that "this is not my statement." He also acknowledged telling Johnson that he assaulted the victim but denied telling her that he choked the victim or put his hands around the victim's neck. The State showed the photographs of the victim's injuries to the Appellant, and he acknowledged inflicting the injuries. Regarding the red marks around her neck, though, he stated that he could not say he caused them because the victim was wearing a necklace.

Brandi Johnson testified on rebuttal for the State that during her interview with the Appellant, "[h]e pretty much said, 'Yeah, I did it. You know, I did it, right. Yeah, I did it.'" After Johnson wrote the Appellant's statement, she read it to him, and he signed it. She said the Appellant seemed to understand what was going on and never said he did not strangle the victim.

The jury convicted the Appellant of aggravated assault by strangulation, a Class C felony, as charged. After a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to eight years in confinement.

## II. Analysis

The Appellant claims that the evidence is insufficient to support the conviction because it "was established, at best, by circumstantial evidence"; because no medical proof was introduced into evidence; and because the victim's ability to scream during the attack contradicts her claim that he was strangling her. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, aggravated assault occurs when a person intentionally or knowingly commits an assault and the assault involved strangulation or attempted strangulation. Tenn. Code Ann. § 39-13-102(a)(1)(A)(iv). A person commits assault

who intentionally or knowingly causes bodily injury to another.  See Tenn. Code Ann. § 39-13-101(a)(1).  "Strangulation" is defined as

> intentionally or knowingly impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim.

Tenn. Code Ann. § 39-13-102(a)(2).

Taken in the light most favorable to the State, the evidence shows that the Appellant pulled the victim out of her car and strangled her while she was on the ground. He later admitted to Brandi Johnson that he choked the victim.  The victim's testimony about the strangulation is direct evidence of his guilt.  See State v. Keen, 31 S.W.3d 196, 218 (Tenn. 2000) (defining "direct evidence" as "evidence which proves the existence of the fact in issue without inference or presumption").  The Appellant's confession to strangling the victim is also direct evidence of his committing the crime.  Monts v. State, 379 S.W.2d 34, 40 (Tenn. 1964), overruled on other grounds by State v. Collier, 411 S.W.3d 886 (Tenn. 2013).  Regarding the Appellant's claim that he could not have strangled the victim because she was screaming, defense counsel specifically asked the victim about her ability to scream during the attack.  The victim explained that "there were intervals where he would stop" applying pressure to her neck and that she screamed "in between."  Photographs of the victim's injuries support her claim of strangulation, showing red marks on the front and back of her neck.  The evidence is more than sufficient to support the Appellant's conviction.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 8 -